## STATE OF CONNECTICUT *v.* RANDY CAYOUETTE
## (9101)

DUPONT, C. J., NORCOTT and LAVERY, Js.

Argued April 24—decision released August 6, 1991

*Thomas Ullman,* assistant public defender, with whom, on the brief, was *Beth A. Merkin,* assistant public defender, for the appellant (defendant).

*Jack Fischer,* deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *David P. Gold,* supervisory assistant state's attorney, for the appellee (state).

LAVERY, J. The defendant appeals from a judgment of conviction, rendered after a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a). The defendant claims that the trial court (1) improperly admitted statements made by the victim as evidence under the spontaneous utterance

exception to the hearsay rule, and (2) improperly instructed the jury on the affirmative defense of cohabitation.

The jury could have reasonably found the following facts. The incident took place on June 17, 1988. Approximately two months before, the victim had been evicted from her apartment. The defendant offered to let the victim move into his apartment. At that time, the defendant and the victim were mere acquaintances.

Once the victim moved in, she and the defendant slept in separate rooms in the apartment. She did the laundry for both of them, and they shared the cooking and food shopping responsibilities, although the two ate together only twice in the two month period. The victim did not pay the defendant any rent. The victim denied ever having had sexual relations with the defendant prior to the sexual assault that occurred on June 17, 1988.

On the evening of June 16, 1988, the victim, the defendant and several friends were at the defendant's apartment drinking and socializing. Eventually, all but one of the friends left the apartment and the defendant went to bed, leaving the victim and the guest on the porch talking. Not long thereafter, the guest left and the victim went into the apartment. Seeing the defendant asleep on the couch, the victim went to the bedroom and fell asleep on the bed.

After she was asleep, the defendant entered the bedroom and woke her up, telling her that one of their friends had broken into the house, had threatened him with a weapon, and was now hiding in the bedroom closet. The victim told him that he was crazy and was lying because there was no one there. The defendant then returned to the living room and the victim went back to sleep.

Later, the defendant entered the bedroom, this time waking the victim by pulling on her arms, and again asserting that one of their friends was in the closet. An argument between the defendant and the victim ensued, and the defendant "went crazy." The defendant dragged the victim by her arms off the bed and onto the floor. The victim was screaming and struggling but was unable to escape. Holding the victim's wrists over her head with one hand, the defendant proceeded to punch her three or four times in the jaw with his other hand. The defendant then removed the victim's shorts and underwear and sexually assaulted her.

Shortly thereafter, the defendant told the victim to "call the cops and get me arrested." The victim told the defendant that she would not have him arrested, but that he should call an ambulance. The defendant called for an ambulance at 4:41 a.m., telling the dispatcher that the victim had fallen.

Ambulance personnel arrived at 4:51 a.m. James O'Connell, a paramedic, who first arrived at the scene, testified that the victim appeared to be "pensive, apprehensive, scared and timid," and that she told him that she had been sexually assaulted.

After the ambulance arrived, a Meriden police officer, Richard Gilgosky, arrived on the scene. Gilgosky testified that he found the victim on the floor with a great deal of blood on her face, and that she also told him that she had been raped by the defendant. Shortly thereafter, Lieutenant Lee Van Hennick, of the Meriden police department, arrived and found the victim still lying on the floor in what he characterized as "a kind of catatonic state." When Van Hennick asked the victim what had happened, she told him that she had been raped by the defendant. The ambulance left the scene at 5:10 a.m., transporting the victim to a hospital emergency room where she was treated for her injuries, which included a broken jaw.

At trial, O'Connell, Gilgosky and Van Hennick were allowed to testify despite defense counsel's hearsay objections. The trial court based its decision to allow the testimony on both the spontaneous utterance exception to the hearsay rule and the constancy of accusation exception to the hearsay rule.

We affirm the judgment of the trial court.

## I

### THE HEARSAY OBJECTION

In *Perry* v. *Haritos,* 100 Conn. 476, 124 A. 44 (1924), our Supreme Court recognized the spontaneous utterance exception to the hearsay rule. This exception allows otherwise inadmissible statements into evidence to prove the truth of the matter asserted if it is proven that (1) the declaration follows some startling occurrence, (2) the declaration refers to the occurrence, (3) the declarant observed the occurrence, and (4) the declaration is made under circumstances that negate the opportunity for deliberation and fabrication by the declarant. *State* v. *Stange,* 212 Conn. 612, 616–17, 563 A.2d 681 (1989); *Perry* v. *Haritos,* supra, 484.

As a preliminary matter, the trial judge must determine whether an utterance qualifies under this exception to the hearsay rule, and that decision will not be disturbed on appeal unless it constitutes an unreasonable exercise of discretion. *State* v. *Stange,* supra; *State* v. *Chesney,* 166 Conn. 630, 638, 353 A.2d 783, cert. denied, 419 U.S. 1004, 95 S. Ct. 324, 42 L. Ed. 2d 280 (1974); *Perry* v. *Haritos,* supra.

On appeal, the defendant concedes that the declarant's statements followed a startling occurrence, were made with reference to the occurrence, and that the declarant observed the occurrence. Nevertheless, the defendant argues that the statements were not made

under circumstances that negate the opportunity for deliberation and fabrication by the victim.

Our review of the record reveals that at 4:41 a.m., just minutes after he had beaten and raped the victim, the defendant called for an ambulance. All three of the victim's statements were made prior to 5:10 a.m., when the ambulance transported the victim to the hospital emergency room. All three statements were made within thirty minutes of the call for an ambulance, which itself was made only a few minutes after the incident occurred. While the short time between the incident and the statement is important, it is not dispositive. *State* v. *Stange,* supra, 618; *Perry* v. *Haritos,* supra. All material facts should be weighed by the trial judge when determining whether a statement qualifies as a spontaneous utterance. *State* v. *Stange,* supra; *Perry* v. *Haritos,* supra.

In this case, other facts indicate that the statements were made by the victim without an opportunity for deliberation or fabrication. O'Connell testified that the victim was "pensive, apprehensive, scared and timid." Gilgosky found the victim on the floor with a great deal of blood on her face. Van Hennick found the victim "in a kind of catatonic state" when he arrived. These facts indicate that the victim was affected by the lingering effects of the attack by the defendant, and that these effects rendered her unable to reflect in order to fabricate what took place. The fact that the statements made by the victim were in response to questions from emergency personnel and police does not defeat their spontaneity. *State* v. *Stange,* supra, 619–20. The decision by the trial judge to allow the testimony of these three witnesses under the spontaneous utterance exception to the hearsay rule was not an unreasonable exercise of discretion and was properly admitted.

In addition, the disputed testimony was allowed under the constancy of accusation exception to the hearsay rule. This exception allows witnesses to testify to the out-of-court statements of a sexual assault victim to corroborate and accredit the victim's testimony at trial. *State* v. *Rodgers,* 207 Conn. 646, 649, 542 A.2d 1136 (1988); see also *State* v. *Dabkowski,* 199 Conn. 193, 199, 506 A.2d 118 (1986); *State* v. *Segerberg,* 131 Conn. 546, 548–49, 41 A.2d 101 (1945); *State* v. *Bethea,* 24 Conn. App. 13, 585 A.2d 1235 (1991). The testimony was properly allowed on this basis as well because the court gave limiting instructions to the jury on constancy of accusation advising them that the testimony was to be used only to corroborate and accredit the victim's testimony, not to prove the truth of the matter asserted.

## II

### THE COHABITATION CHARGE

The defendant objects to the trial judge's charge on his affirmative defense of cohabitation under General Statutes § 53a-67 (b).[1] Before reaching the defendant's claims, we must first address the state's assertion that this issue was not properly preserved at trial. We do not agree with the state's contention.

In compliance with Practice Book § 852, the defendant filed a request to charge with the court, prior to the rendition of the jury charge. In addition, the defendant raised a timely objection to the charge on cohabi-

---

[1] General Statutes (Rev. to 1987) § 53a-67 (b) provides: "In any prosecution for an offense under this part, except an offense under section 53a-70b, it shall be an affirmative defense that the defendant and the alleged victim were, at the time of the alleged offense, living together by mutual consent in a relationship of cohabitation, regardless of the legal status of their relationship."

General Statutes § 53a-67 (b) was revised in 1990 by Public Acts 1990, No. 90-162.

tation after it was rendered. Thereafter, the court rendered an additional amended charge to the jury on cohabitation. The defendant did not object or take an exception to this second charge.

Practice Book § 852 provides in pertinent part: "The supreme court shall not be bound to consider error as to the giving of, or the failure to give, an instruction unless the matter is covered by a written request to charge *or* exception has been taken by the party appealing immediately after the charge is delivered." (Emphasis added.) Although the defendant failed to object to the second jury charge on the issue of cohabitation, the fact that he complied with the requirements of the rule of practice, by properly filing a request to charge with the court, preserved the issue for appeal.

The defendant first asserts that the court's charge relating to the definition of cohabitation was improper in that it was more demanding than the law requires.[2] We conclude that the charge was proper.

[2] After the defendant's counsel objected to the first cohabitation charge, the trial judge charged the jury again as follows: "The defendant has the burden of proving by a fair preponderance of the evidence that the defendant and the victim, this is if you get to that issue of the affirmative defense, proving at the time of the offense they were living together by mutual consent in a relationship of cohabitation. The law does not make this defense available to all persons just because they happen to be living together. Rather, as I've stated, the statute requires that the parties must live together by mutual consent in a relationship of cohabitation.

"In other words, living together is not sufficient. The parties must be cohabitating. Cohabitation is defined in our law as involving a relationship of husband and wife, although they are not legally married. This relationship of living together as husband and wife includes all of the many facets of married life in addition to sexual relations. The defendant must prove by a fair preponderance of the evidence that there was a mutual assumption of these marital rights, duties and obligations which are usually manifested by married people. In order for him to meet his burden of proof.

"As you recall there was a conflict in the testimony between the defendant and [the victim] as with respect to their mutual sexual relations and other details of their living together. Even if you find that the parties had previously engaged in consensual sexual intercourse you need not find that

The trial court's charge defined cohabitation as "involving a relationship of husband and wife, although [the victim and the defendant] are not legally married." The court went on to instruct that a mutual assumption of marital rights, duties and obligations that are usually manifested by married people is necessary for cohabitation. In addition, the trial court's charge required both an "acknowledgment and recognition" by the parties that their relationship was equivalent to marriage. This charge is consistent with the well settled principle that agreement is necessary for a cohabitation relationship to exist. *State* v. *Arroyo,* 181 Conn. 426, 432–33, 453 A.2d 967 (1980).[3] The defendant also maintains that the charge on cohabitation unduly focused on the time requirement of the affirmative defense.

It is well settled that when reviewing a jury charge we must consider the charge as a whole and not criti-

a cohabitating relationship has been proven. Evidence of intercourse alone does not prove a cohabitating relationship. Rather as I have said cohabitation requires both an acknowledgment and recognition by the parties that their relationship is that of the nature of a husband and wife.

"Moreover, you may consider evidence not only that the parties are living together but also any evidence that may have been offered bearing on the reputation amongst their friends and the community in general that these two were living together as man and wife even though they weren't legally married. Those are the issues that you should consider in determining whether the cohabitation has been proven.

"Please remember that the time at issue here concerning the status of their relationship is the day of the alleged assault. If you happen to find at an earlier point in their relationship that they were cohabitating as I've supplied it to you but for whatever other reason that cohabitation relationship had terminated prior to the day of the alleged incident on June 16, then the defendant would not have met his burden of proof of proving that on that day they were engaged in a relationship of cohabitation."

[3] A similar charge is found in D. Wright, Connecticut Jury Instructions (2d Ed.) § 736i, which provides the following definition of cohabitation. "Cohabitation means actually living together as husband and wife, acknowledgment and recognition of each other as husband and wife to friends and acquaintances and the public as such, and enjoying the general reputation of being married and living together as husband and wife."

cally dissect the charge. *State* v. *Taylor,* 196 Conn. 225, 492 A.2d 155 (1985); *State* v. *Reed,* 174 Conn. 287, 386 A.2d 243 (1978). In the case before us, the trial court first read the statutory provision regarding the affirmative defense of cohabitation to the jury. The court then explained that the key time at issue was that of the alleged assault, and that, if the jury found that the cohabitation relationship had terminated prior to the alleged assault, the defendant would not have met his burden of proving the affirmative defense of cohabitation. By way of this explanation, the trial court properly set forth the statutory requirements for the affirmative defense, including the necessity of cohabitation at the time of the sexual assault, in order to emphasize the importance of the time element to the jury. *State* v. *Cazimovsky,* 20 Conn. App. 190, 192, 565 A.2d 254 (1989). Considering the charge on cohabitation as a whole, we find that it properly defines this affirmative defense in a sexual assault case.

The judgment is affirmed.

In this opinion the other judges concurred.