# STATE OF CONNECTICUT *v.* RICHARD RODRIGUEZ
## (13900)

Heiman, Schaller and Hennessy, Js.

Argued February 16—decision released September 26, 1995

*Kent Drager*, assistant public defender, for the appellant (defendant).

*Nancy Gillespie*, deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *David P. Gold*, supervisory assistant state's attorney, for the appellee (state).

HENNESSY, J. The defendant, Richard Rodriguez, appeals[1] from the judgment of conviction, rendered after a trial by jury, of two counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), one count of conspiracy to commit robbery in the third degree in violation of General Statutes §§ 53a-48 (a) and 53a-136, one count of burglary in the third degree in violation of General Statutes § 53a-103, one count of conspiracy to commit burglary in the third degree in violation of General Statutes §§ 53a-48 (a) and 53a-103, two counts of kidnapping in the first degree in violation of General Statutes §§ 53a-92 (a) and 53a-8, two counts of larceny in the second degree in violation of General Statutes §§ 53a-123 (a) and 53a-8, and

---

[1] This appeal was taken originally to the Supreme Court. Pursuant to Practice Book § 4023, the Supreme Court transferred the appeal to this court.

one count of larceny in the third degree in violation of General Statutes §§ 53a-124 (a) and 53a-8. The defendant claims that the trial court improperly (1) denied his motion to suppress evidence, (2) found that there was sufficient evidence to support his convictions, (3) ruled on the admissibility of certain statements of the deceased victim, and (4) instructed the jury on intoxication in relation to the state's burden of proving specific intent. The defendant also claims that his due process rights were violated by (5) prosecutorial misconduct and (6) the imposition of improper sentences for his conspiracy conviction.[2] Because we find that the trial court improperly denied the defendant's motion to suppress, we reverse the judgment of conviction.

The jury could reasonably have found the following facts. On December 2, 1991, Aimee Harris and William Harris, residents of 2330 Shepard Avenue in the town of Hamden, were victims of a robbery in their home perpetrated by two men wearing masks, one of whom was armed with a gun. During the course of the robbery, the victims had property taken from their persons as well as their home. In addition, the robbers bound the Harrises with neckties. Within minutes after the robbers left, the victims freed themselves and called 911. The Hamden police arrived shortly thereafter, and broadcast the details of the robbery over the police radio.

As Sergeant John Kennelly of the Hamden police department approached the area of the robbery, he observed a red car parked on the shoulder of the road approximately twenty-five feet from the Harris driveway. Standing next to the passenger side of the car was Daniel Garrison, whom Kennelly had known for many

---

[2] The defendant also claims that the trial court improperly admitted into evidence a gun found in the area where the defendant was arrested. Because our conclusion that the evidence was sufficient to sustain the defendant's convictions of robbery in the first degree addresses this claim, we do not address it separately. See footnote 9.

years. A white female, later identified as Carol Orsene, was sitting in the driver's seat of the car and a Hispanic male, with dark hair and a mustache, was in the back-seat. Kennelly spoke briefly with Garrison, warning him to leave the area because of a problem, and proceeded to the Harris home.

Later that evening, the defendant was arrested on unrelated charges. He was then identified by Kennelly as the Hispanic male from the red car parked near the Harris driveway. The next day the defendant was arraigned on charges relating to the robbery at the Harris home. He was convicted after a jury trial and this appeal followed.

I

The defendant first claims that the trial court improperly denied his motion to suppress evidence. The following additional facts are relevant to our discussion of this issue. Approximately twenty-five minutes after hearing the broadcast description of the perpetrators, Hamden police officer Gary Komoroski was patroling Shepard Avenue. He observed a man in the middle of the roadway, wearing jeans, and waving his hands at cars in an apparent attempt to get a ride. Komoroski drove past the man, pulled into the parking lot of a fire station, and waited for the man to approach the cruiser. When he approached, Komoroski got out of the cruiser and questioned him, thinking he might be a motorist in distress.

Upon questioning, Komoroski learned that the man did not know what town he was in, that he claimed to be on his way to Hartford from New Haven although Shepard Avenue was not a direct route between these locations, and that he had been put out of a car by two people whose names he did not know. Komoroski calculated that someone traveling on foot could have covered the distance between the Harris house and

the fire station in the time that had elapsed since the robbery. On the basis of these facts, Komoroski radioed the officers at the Harris home to inform them that he was detaining a robbery suspect.

While waiting for someone to come from the Harris home, Komoroski decided to cite the man for the infraction of reckless use of a highway. See General Statutes § 53-182. Komoroski asked the man if he had any identification and, without checking his pockets, the man responded that he did not. Komoroski then either asked him to check his pockets for identification or told him to empty his pockets.[3] The man emptied his pockets onto the trunk of Komoroski's cruiser, and among the items was an identification card from a needle exchange program, a rubber glove, and a tin foil packet. The tin foil packet contained a glassine envelope of white powder, which the man stated was baking powder used in freebasing cocaine. Komoroski then arrested the man, who has been identified as the defendant in this case, for possession of drug paraphernalia and placed him in the cruiser.

Within a few minutes, Kennelly arrived at the fire station parking lot, looked into Komoroski's cruiser, and immediately recognized the defendant as the Hispanic male he had seen in the backseat of the red car near the Harris driveway when he first responded to the reported robbery. Kennelly got into Komoroski's

---

[3] In the original memorandum of decision the court did not specify whether the search of the defendant's pockets was voluntary. In response to our request for an articulation pursuant to Practice Book § 4183 (10), the trial court found both that Komoroski asked the defendant to "check his pockets" and that he asked the defendant to "empty his pockets." While the trial court stated in its articulation that the defendant emptied his pockets freely and voluntarily, this conclusion is inconsistent with and not supported by the trial court's finding that Komoroski asked the defendant to "empty his pockets." See State v. Fields, 31 Conn. App. 312, 325, 624 A.2d 1165, cert. denied, 226 Conn. 916, 628 A.2d 989 (1993).

car, read the defendant *Miranda*[4] warnings, and questioned him. The defendant admitted that he had been in the backseat of the red car earlier in the evening. The defendant said the car had been pulled over near the Harris house so he and his companions could use cocaine. The defendant told Kennelly that he had argued with Garrison and had been forced to get out of the car. The defendant then changed his story to say that after the car was pulled over he remained in the car to use cocaine while Garrison and his female companion left the car and walked up the Harris driveway.

At this time, Officer Nicholas Guerrera of the Hamden police, who had arrived at the scene during Kennelly's questioning, transported the defendant to the Harris house for a show-up identification. At the Harris home, the lighting was arranged so that the Harrises could see the defendant but the defendant could not see them. The Harrises were unable to identify the defendant as one of the perpetrators. Guerrera then transported the defendant to the Hamden police station. During the ride the defendant stated, "the old man and old woman couldn't pin me for this."

The next morning, the defendant was transported from the Hamden police station to a cell at the geographical area seven courthouse to await arraignment. Upon arrival, the sheriffs booked the defendant before assigning him to a cell. During the booking process, Deputy Sheriff William Joseph Benson noticed a ring on the defendant's pinky finger and asked him to remove the ring and to place it on the booking desk. The defendant removed the ring from his finger and placed it in his mouth. After the defendant repeatedly refused to produce the ring, Detective Thomas Rhone of the Hamden police department obtained a search and seizure warrant allowing X rays to be taken of

---

[4] *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

the defendant in order to locate the ring. When Rhone initiated the transport of the defendant to a hospital for X rays, the defendant produced the ring and turned it over to Rhone. Later that morning, the ring was shown to Aimee Harris who identified it as one of the rings taken from her home during the robbery. On the afternoon of December 3, 1991, the defendant was arraigned for possession of drug paraphernalia and robbery.

The defendant claims that the trial court improperly denied his motion to suppress the following: (1) all items taken from his person on the evening of December 2, 1991, (2) all oral statements made by him after he was detained and arrested by Komoroski on December 2, 1991, (3) all oral statements made by him during the transport to and from the Harris home on December 2, 1991, (4) the ring seized while the defendant was in custody at the geographical area seven courthouse, and (5) a tape-recorded statement made by the defendant on December 3, 1991. We agree.

Although both the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution evince a clear preference for arrests pursuant to a warrant; *State* v. *Heinz*, 193 Conn. 612, 617, 480 A.2d 452 (1984); *State* v. *Federici*, 179 Conn. 46, 51–52, 425 A.2d 916 (1979); a warrantless arrest can be made in a public place if the arresting officer has probable cause to believe a felony has been committed by the suspect. *State* v. *Conley*, 31 Conn. App. 548, 554–55, 627 A.2d 436, cert. denied, 227 Conn. 907, 632 A.2d 696 (1993); see General Statutes § 54-1f (b). "Probable cause means more than mere suspicion. There must be facts and circumstances within the officer's knowledge, and of which he has trustworthy information, sufficient to justify the belief of a reasonable person that an offense has been or is being committed." (Internal quotation marks omitted.) *State* v. *Conley*, supra, 555; quoting *State* v. *Velez*, 215 Conn. 667, 672,

577 A.2d 1043 (1990); *State* v. *Hunter*, 27 Conn. App. 128, 133–34, 604 A.2d 832 (1992).

Our review of the trial court's finding of probable cause in connection with a motion to suppress is not plenary. "We will not disturb a trial court's conclusions [in denying a motion to suppress] unless they are legally and logically inconsistent with the facts." *State* v. *Conley*, supra, 31 Conn. App. 554; see also *State* v. *Cofield*, 220 Conn. 38, 44, 595 A.2d 1349 (1991). "Our analysis involves a two-pronged inquiry. 'First, where the court's legal conclusions are challenged, we must decide if they are legally and logically correct, and if they are supported by the facts set forth in the memorandum of decision. *State* v. *Zindros*, [189 Conn. 228, 238, 456 A.2d 288 (1983), cert. denied, 465 U.S. 1012, 104 S. Ct. 1014, 79 L. Ed. 2d 244 (1984)]. Second, if the factual basis of the court's decision is challenged, we must determine whether the facts in the memorandum are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. Id.' " *State* v. *Conley*, supra, 553–54.

The trial court denied the motion to suppress on the ground that "[a]ll of [the] circumstances when viewed in their totality . . . establish a reasonable articulable set of facts which were sufficiently specific to detain the defendant." The trial court enunciated the following factors as supporting its finding of probable cause: (1) there had been a broadcast report of the recent robbery; (2) the defendant committed an infraction of reckless use of a highway; (3) the defendant behaved suspiciously when first observed by the police; (4) the defendant did not know where he was and gave an implausible story about the route he was traveling; (5) the defendant could not give the names of the people with whom he claimed to have been traveling who had put him out of their car; (6) Komoroski properly calcu-

lated that the defendant was within walking distance of where the burglary occurred; (7) the defendant was heading away from the scene of the burglary; (8) the defendant gave Komoroski a false name; (9) the defendant said he had no identification without checking; (10) the identification card in the defendant's pocket was not reliable; (11) the defendant had a rubber glove in his pocket; (12) the defendant had a packet of white powder in his pocket; (13) Kennelly immediately recognized the defendant as having been in the car near the Harris driveway with another man, when the perpetrators had been reported to be two males; (14) when questioned by Kennelly the defendant changed his story about what he had been doing and where he had been going; and (15) after being unable to see the victims at the show-up, the defendant made the statement that "the old man and the old woman" could not pin the burglary on him.

The trial court based its decision on the validity of the initial detention. It was not the initial detention, however, but the subsequent search that led to the initial arrest of the defendant for possession of drug paraphernalia. While the initial detention may have been justified, the trial court expressly declined to rule on the constitutionality of Komoroski's search of the defendant's pockets.[5]

The defendant argues that the trial court's express refusal to rule on the constitutionality of the search is legally and logically inconsistent with the court's denial

[5] The trial court's decision provides: "He was then asked if he had—if he would check again for identification. Whether he was asked to empty his pockets or he did so voluntarily or whatever, an identification card came out which the officer construed as not being reliable anyway and that too is another item." This language is not unambiguous. We adopt the understanding shared by the defendant and the state, which is that the trial court failed to rule on the constitutionality of the search of the defendant's pockets.

of the motion to suppress. The defendant asserts that because the arrest resulted from an unjustified search, the fruits of both the search and the arrest should have been suppressed. Although we conclude that the search was in fact unjustified, the state contends that such a conclusion does not require reversal of the trial court's ruling on the motion to suppress.

The state asks us to affirm the trial court's denial of the motion to suppress on the ground that the search of the defendant's pockets was not essential to the determination that probable cause existed to arrest the defendant for the Harris robbery. The state argues that probable cause to arrest the defendant for the Harris robbery existed as soon as Kennelly arrived at Komoroski's cruiser and recognized the defendant as the person from the red car parked near the Harris driveway. This argument is slightly off focus, however, because it asks us to assess the existence of probable cause to arrest the defendant for the Harris robbery at a point in time *after* the defendant was actually arrested. This we cannot do.

The state relies on *State* v. *Carter*, 189 Conn. 611, 458 A.2d 369 (1983), for the principle that the suppression of evidence resulting from an illegal detention is not required if there was probable cause to support the arrest at some time prior to when the evidence was obtained. We do not find *Carter* to be apposite. In *Carter*, the defendant was detained in connection with a recent burglary in the immediate vicinity. During this detention it was established that the defendant was wearing running shoes with a tread similar to that of a footprint outside the recently burglarized home. The police officers detaining the defendant decided to bring him to the scene of the burglary to compare the tread of his running shoes to the footprint. Our Supreme Court declined to rule on whether the transport of the defendant would have been within the scope of an inves-

tigatory detention and held that because there was probable cause to arrest the defendant prior to the transport, the evidence flowing from the transport did not need to be suppressed, even though the officers did not intend to arrest the defendant prior to the transport. Id., 618–19.

This case is not like *Carter* because the defendant was arrested prior to Kennelly's identification. The state claims that the chain of events leading to probable cause for the Harris robbery "was wholly independent of the purportedly illegal search and custodial arrest for possession of drug paraphernalia." The trial court, however, made no findings to support this claim, and we cannot speculate as to what might have happened had the initial arrest not taken place, including whether there might have been probable cause for a lawful arrest at some later time.[6] See *State* v. *Reagan*, 209 Conn. 1, 8–9, 546 A.2d 839 (1988). We will review the existence of probable cause to arrest the defendant for the Harris robbery only as of the time of the arrest for possession of drug paraphernalia.

A great number of the facts found by the trial court to support the finding of probable cause flow from the search of the defendant's pockets or are otherwise irrelevant to the determination of probable cause at the

[6] For this reason, we also do not consider the state's claim of inevitable discovery, raised for the first time on appeal, which would require us to find facts to support the initiation and continuation of an investigatory detention as well as probable cause for the defendant's arrest in connection with the Harris burglary. We can perceive no basis in this record for a conclusion that "the lawful means which made discovery inevitable were possessed by the police and were being actively pursued *prior* to the occurrence of the constitutional violation." (Emphasis in original.) *State* v. *Badgett*, 200 Conn. 412, 433, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986). Thus, this case does not present an appropriate instance for remand to the trial court to determine whether the inevitable discovery exception to the exclusionary rule applies. Compare id., 433–34; see *State* v. *Billias*, 17 Conn. App. 635, 637 n.3, 555 A.2d 448 (1989).

time of the defendant's arrest. First, Komoroski had no way of knowing that the defendant had given a false name at the time of his arrest. Additionally, the identification card for the needle exchange program, the rubber glove, and the packet of white powder are the items we cannot consider without a finding that they were lawfully seized. Finally, Kennelly's identification of the defendant, and the statements made by the defendant to Kennelly and Guerrera cannot be used to support a finding of probable cause for an arrest prior to the time the identification and statements were made.

The facts left for our determination of whether probable cause existed to arrest the defendant in connection with the Harris robbery are those numbered (1) through (7), and (9): (1) there had been a broadcast report of the recent robbery; (2) the defendant committed an infraction of reckless use of a highway; (3) the defendant behaved suspiciously when first observed by the police; (4) the defendant did not know where he was and gave an implausible story about the route he was traveling; (5) the defendant could not give the names of the people with whom he claimed to have been traveling who had put him out of their car; (6) Komoroski properly calculated that the defendant was within walking distance of where the burglary occurred; (7) the defendant was heading away from the scene of the burglary; and (9) the defendant said he had no identification without checking.[7]

---

[7] In its brief, the state directs us to additional facts relevant to the determination of probable cause: Komoroski knew one of the perpetrators had a mustache; Komoroski knew the report of two Caucasian perpetrators could be unreliable due to the pantyhose masks; Komoroski knew the perpetrators might have worn M.C. Hammer-type pants over jeans in order to alter their appearance quickly; Kennelly had decided that Garrison fit the description of one of the perpetrators before he viewed the defendant in Komoroski's cruiser. In this case, however, the trial court conscientiously detailed the facts that the state had established in the suppression hearing. In such a situation "we are not free to add facts which are not found and which are not undisputed. See *State* v. *Perez*, 181 Conn. 299, 302–303, 435 A.2d 334

These properly considered factors, viewed in their totality, do not support a finding that there was probable cause to arrest the defendant for either possession of narcotics paraphernalia or the Harris burglary. "The quantum of evidence necessary to establish probable cause exceeds mere suspicion . . . . [T]here is often a fine line between mere suspicion and probable cause, and [t]hat line necessarily must be drawn by an act of judgment formed in light of the particular situation and with account taken of all the circumstances." (Internal quotation marks omitted.) *State* v. *Magnotti*, 198 Conn. 209, 213, 502 A.2d 404 (1985). Although Komoroski's suspicions were appropriately raised by the defendant's conduct in the vicinity of the recent robbery, we cannot find that these suspicions rose to the level of probable cause without consideration of the factors flowing from the arrest for possession of narcotics paraphernalia.

We conclude that the trial court improperly denied the defendant's motion to suppress each of the following: (1) all items taken from his person on the evening of December 2, 1991; (2) all oral statements made by him after he was detained and arrested by Komoroski on December 2, 1991; (3) all oral statements made by him during the transport to and from the Harris home on December 2, 1991; (4) the ring seized while the defendant was in custody at the geographical area seven cell block; and (5) a tape-recorded statement made by the defendant on December 3, 1991. This conclusion does not automatically require a reversal of the defendant's conviction. In certain circumstances we have held that, because a fourth amendment violation was harmless beyond a reasonable doubt, the resulting conviction could be affirmed. See, e.g., *State* v. *Shifflett*, 199 Conn.

(1980)." *State* v. *Martin*, 2 Conn. App. 605, 614, 482 A.2d 70 (1984), cert. denied, 195 Conn. 802, 488 A.2d 457, cert. denied, 472 U.S. 1009, 105 S. Ct. 706, 86 L. Ed. 2d 721 (1985).

718, 508 A.2d 748 (1986). We find, however, that this is not such a case.

"The ' "harmlessness of an error depends upon its impact on the trier and the result' " . . . and the test is whether 'there is a reasonable possibility that the improperly admitted evidence contributed to the conviction.' *Schneble* v. *Florida*, 405 U.S. 427, 432, 92 S. Ct. 1056, 31 L. Ed. 2d 340 (1972)." (Citations omitted.) *State* v. *Shifflett*, supra, 199 Conn. 751–52; see also *State* v. *Daugaard*, 231 Conn. 195, 212, 647 A.2d 342 (1994), cert. denied, 513 U.S. 1099, 115 S. Ct. 770, 130 L. Ed. 2d 666 (1995); *State* v. *Santiago*, 224 Conn. 325, 333, 618 A.2d 32 (1992). The strength of the evidence that should have been suppressed is such that we cannot conclude that it did not contribute to the defendant's conviction. Thus, the defendant was entitled to suppression of the evidence enumerated in his motion to suppress, and the case must be remanded for a new trial.

## II

The defendant next claims that there was insufficient evidence to support "all or at least some of his convictions." We review this claim, despite our conclusion that the defendant is entitled to a new trial because if the evidence is in fact insufficient the defendant would be entitled to an acquittal. *State* v. *Wolff*, 37 Conn. App. 500, 507, 657 A.2d 650 (1995); *State* v. *Trujillo*, 12 Conn. App. 320, 337, 531 A.2d 142, cert. denied, 205 Conn. 812, 532 A.2d 588 (1987).

In reviewing sufficiency claims, this court first considers the evidence presented at trial, construing it in the light most favorable to sustaining the jury's verdict. We then determine whether, from the facts thus established and the reasonable inferences to be drawn therefrom, the jury could reasonably have concluded that the cumulative effect of the properly admitted evidence established guilt beyond a reasonable doubt. *State* v.

*Joyner*, 225 Conn. 450, 455, 625 A.2d 791 (1993); *State* v. *Fields*, 31 Conn. App. 312, 326–27, 624 A.2d 1165, cert. denied, 226 Conn. 916, 628 A.2d 989 (1993). Our review of a claim of insufficiency of the evidence encompasses all of the evidence adduced at trial, including evidence determined to have been admitted improperly. Here, we conclude that the evidence was sufficient for the jury to find the defendant guilty of each of the crimes charged, even without reliance on the evidence that should have been suppressed.

### A

The defendant was convicted of two counts of larceny in the second degree, and one count of larceny in the third degree. "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner." General Statutes § 53a-119. The defendant was charged with committing larceny in the second degree by obtaining property from the persons of Aimee Harris and Richard Harris. See General Statutes § 53a-123 (a) (3). He was charged with committing larceny in the third degree by obtaining property with a value of greater than $1000. See General Statutes § 53a-124 (a) (2).

The jury could reasonably have found that the two perpetrators entered the Harris home and then separated. One of the perpetrators remained with Aimee Harris and obtained property from her person, including a ring. The other perpetrator remained with her husband and obtained property from his person, namely a ring and watch. The jury could further have found that the value of all the property taken was greater than $1000. Therefore, the jury could reasonably have con-

cluded that the three charged counts of larceny took place, as well as a count of burglary in the third degree.[8]

The defendant challenges these convictions, as well as his two convictions for robbery in the first degree, arguing that the state failed to prove that he was one of the perpetrators who entered the Harris home on December 2, 1991. The defendant bases his argument on the following facts: the Harrises could not identify him immediately after the robbery, he did not match the description given of a large Caucasian man, he was not dressed as described by the Harrises, Aimee Harris did not identify this assailant's accent as Hispanic, Orsene did not recognize the defendant as the "Rodriguez" accompanying her and Garrison in the red car, and Orsene did not see the defendant enter the Harris home.

Our review of the record indicates that the state presented sufficient evidence from which the jury could infer that the defendant entered the Harris home with Garrison on December 2, 1991. Aimee Harris stated that one of the intruders had been wearing a dark jacket, baggy pants and white sneakers, and when the defendant was arrested he was wearing a dark leather jacket and white sneakers. Orsene testified that "Rodriguez" had been picked up by Garrison on the street where the defendant's father lived. Orsene also testified that "Rodriguez" and Garrison went up the Harris driveway shortly before the robbery, and her observations from the car both before and after the robbery tended to prove that "Rodriguez" had entered the Harris home with Garrison. Despite the fact that Orsene did not identify the defendant as "Rodriguez" from the evening of December 2, 1991, the jury could reasonably infer

---

[8] General Statutes § 53a-103 (a) provides: "A person is guilty of burglary in the third degree when he enters or remains unlawfully in a building with intent to commit a crime therein."

that the defendant was "Rodriguez" based on Kennelly's testimony that the defendant had been in the red car with Garrison and Orsene.

Construing all these facts in the light most favorable to sustaining the verdict, we conclude that the jury could reasonably have found beyond a reasonable doubt that the defendant was one of the intruders at the Harris home on December 2, 1991. Because the jury could reasonably have concluded that the defendant was one of the intruders, and that these intruders committed the charged larcenies, the evidence is sufficient to sustain the defendant's larceny and burglary convictions.

## B

The defendant also claims that the evidence was insufficient to prove that a gun found in the vicinity of the robbery and admitted into evidence as state's exhibit DD was the gun used in the incident and that, therefore, the evidence was insufficient to establish that the perpetrators were armed with a deadly weapon as required by General Statutes § 53a-134 (a) (2). Robbery occurs when a larceny is effectuated by one who "uses or threatens the immediate use of physical force upon another person . . . ." General Statutes § 53a-133. The defendant was charged with robbery in the first degree under the theory that "he or another participant in the crime . . . [was] armed with a deadly weapon . . . ." General Statutes § 53a-134 (a) (2). When the deadly weapon involved is a firearm, proof that the firearm is operable is an essential element of the crime charged. General Statutes § 53a-3 (6); *State* v. *Hawthorne*, 175 Conn. 569, 572, 402 A.2d 759 (1978). The defendant concedes in his brief that the state offered evidence sufficient for the jury to find beyond a reasonable doubt that state's exhibit DD was an operable gun. The ques-

tion that remains is was the evidence sufficient to prove that this gun was that used in the Harris robbery.

The jury could reasonably have found the following facts relevant to this claim. On the evening of December 2, 1991, Orsene accompanied Garrison and the defendant to the Harris home in a red car. Upon their arriving in the vicinity of the Harris home, Garrison drove up the driveway to the house, turned around, and drove back down to the road. At this time, Garrison and the defendant got out of the car and Orsene moved to the driver's seat. Garrison said to Orsene, "Give me the gun," and Orsene responded, "Get it yourself." Garrison then reached into the car and removed an item from under the backseat.

Orsene drove away from the Harris driveway on Shepard Avenue to a store where she could turn around. Orsene then returned to the area of the Harris driveway and there she saw police vehicles with lights activated. Orsene drove past the driveway, turned around and drove back, and continued to pass by the Harris driveway until she saw Garrison and the defendant coming out of the woods. Garrison was carrying a bag. As Garrison and the defendant got into the car, Kennelly stopped to talk to Garrison, and warned him to leave the area. Orsene drove the car away from the Harris driveway. Orsene turned the car onto another street and pulled over so that Garrison could move to the driver's seat and Orsene moved to the front passenger seat.

After being picked up by Orsene, Garrison appeared nervous and was yelling. Soon after taking the wheel, he told the defendant to get out of the car and the defendant was dropped off at a V-shaped intersection. At this point, Garrison threw the bag he had been carrying out of the car window and continued to drive. Garrison decided to throw the gun out of the car, and Orsene rolled down the passenger window. Garrison

threw the gun out Orsene's window about one minute after dropping off the defendant. This was the only time Orsene saw the gun and she described it as a big, thick silver gun with a white handle.

At trial, Orsene was shown a handgun marked as state's exhibit DD for identification. Orsene could not identify this gun as that she had seen Garrison throw out the car window, although she did testify that it was of the same size and shape. Orsene stated that state's exhibit DD had the same silver barrel and was of the same thickness as the gun she had seen Garrison throw out the car window, but that exhibit DD had a black handle instead of the white handle she recalled. At this time, the trial court ruled that state's exhibit DD could not be admitted into evidence because there was no connection between the gun and the case against the defendant.

Later, Detective John Riordan of the Hamden police department testified that on the evening of December 2, 1991, while the Hamden police were investigating the robbery, the gun marked state's exhibit DD was found in the woods near the scene of the defendant's arrest. The gun was found one to two feet off the road, approximately 100 feet from the firehouse where Komoroski arrested the defendant. After this testimony the trial court admitted the gun into evidence over the defendant's objection.

On the basis of these facts, the jury could reasonably infer that the gun found in the woods off Shepard Avenue had been thrown out of the red car by Garrison, and that Garrison threw it out of the car because he had used it in the course of the Harris robbery.[9] Riordan

---

[9] The defendant also claims that the trial court improperly admitted state's exhibit DD into evidence because there was no evidence connecting the gun to this case. Our discussion of the sufficiency of the evidence that the defendant was guilty of robbery in the first degree is also dispositive of this claim.

also testified that state's exhibit DD had been subject to ballistics tests and that it was operable. The defendant concedes in his brief that this evidence was sufficient for the jury to find beyond a reasonable doubt that the gun was operable.

We conclude that this evidence was sufficient for the jury to find that a robbery in the first degree was committed at the Harris home. The defendant contends, however, from this evidence, he cannot be found guilty of two counts of robbery in the first degree. The defendant posits that because he remained in a room alone with Aimee Harris, while Garrison, who possessed the gun, was alone in another room with Richard Harris, two separate and unconnected larcenies by robbery occurred and that he is, at most, criminally liable for only one of them. Viewing the events of December 2, 1991, in this light, the defendant asserts that he was the sole unarmed participant in the robbery of Aimee Harris, and that he was not a participant in Garrison's armed robbery of Richard Harris. We disagree.

Our Supreme Court has previously held that activity occurs "in the course of" a robbery if it occurs "during the continuous sequence of events surrounding the tak-

The trial court could reasonably have concluded that the testimony of Orsene and Riordan was sufficient to allow the jury to reasonably infer that the gun found by Riordan was the same gun Garrison had thrown out of the car and that the gun had been used in the robbery committed by Garrison and the defendant. Thus, state's exhibit DD was relevant because it could be construed to "establish a fact in issue or to corroborate other direct evidence in the case." (Internal quotation marks omitted.) *State* v. *Greene*, 209 Conn. 458, 477–78, 551 A.2d 1231 (1988). Although the jury could also have concluded that the gun was found coincidentally and had no connection to the Harris robbery, this possibility affects the weight of the evidence and not its admissibility. *State* v. *Joly*, 219 Conn. 234, 252, 593 A.2d 96 (1991). The admission into evidence of state's exhibit DD, as well as evidence that the gun was operable, was well within the broad discretion of the trial court. See *State* v. *Pina*, 185 Conn. 473, 476–77, 440 A.2d 962 (1981); *State* v. *Gilchrist*, 25 Conn. App. 104, 108–10, 593 A.2d 507, cert. denied, 220 Conn. 905, 593 A.2d 970 (1991).

ing or attempted taking, even though some time immediately before or after . . . ." *State* v. *Ghere*, 201 Conn. 289, 297, 513 A.2d 1226 (1986); *State* v. *Gordon*, 185 Conn. 402, 410–11, 441 A.2d 119 (1981), cert. denied, 455 U.S. 989, 102 S. Ct. 1612, 71 L. Ed. 2d 848 (1982). In this case, the jury could reasonably have found that each robbery occurred in the context of a single sequence of events involving two participants, one of whom was armed with a deadly weapon. It is immaterial that Garrison, the armed participant, was in another room at the time Aimee Harris surrendered her property to the defendant. It is also immaterial that at the time Garrison was obtaining property from Richard Harris the defendant was in a different room. The entire sequence of events involved two intruders who separated within the Harris home to complete the robbery of each occupant more efficiently. Thus, each intruder was a participant in each robbery, and the jury could reasonably have found the defendant guilty of both counts of robbery in the first degree.

## C

We turn now to consideration of the sufficiency of the evidence to support the defendant's remaining convictions for conspiracy and kidnapping.

The defendant was charged with both conspiracy to commit robbery in the third degree and conspiracy to commit burglary in the third degree. "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy." General Statutes § 53a-48 (a). As discussed previously, the evidence was sufficient for the jury to conclude that the defendant committed both burglary in the third degree pursuant to § 53a-103 and robbery in the third degree pursuant to

§ 53a-136. The jury could also have reasonably believed, relying on Orsene's testimony, that the defendant acted pursuant to an agreement with Garrison in committing these crimes. Therefore, we conclude that the evidence was sufficient to establish the defendant's guilt in connection with each of the conspiracy charges.

The defendant was also charged with two counts of kidnapping in the first degree. "A person is guilty of kidnapping in the first degree when he abducts another person and . . . he restrains the person abducted with intent to . . . accomplish or advance the commission of a felony . . . ." General Statutes § 53a-92 (a) (2) (B).

The jury could reasonably have found that after entering the Harris home, the defendant and Garrison restrained and removed property from the persons of both Aimee Harris and Richard Harris. Furthermore, the evidence reveals that in the course of the robbery both Aimee and Richard Harris were bound with neckties. From these facts, the jury could reasonably have concluded that the defendant was liable, either as an accessory or as a principal, for the kidnapping of both Aimee Harris and Richard Harris.

We conclude, therefore, that even without consideration of the evidence that should have been suppressed, the evidence was sufficient to establish the defendant's guilt in connection with each crime charged.

### III

The defendant next claims that the trial court made improper evidentiary rulings concerning certain statements of the deceased victim. We consider these claims because they are likely to arise on retrial. The defendant first argues that the trial court improperly admitted into evidence a statement Richard Harris made to his wife immediately following the robbery. The defendant then argues that the trial court improperly excluded from

evidence a tape-recorded statement Harris made to the police several hours after the robbery. We disagree with each claim.

The following additional facts are necessary for our discussion of these issues. Immediately after the robbers left their home, Aimee Harris and Richard Harris began to free themselves from the neckties used to tie them during the robbery. As soon as she was free, Aimee Harris dialed 911 from the telephone in the den of their home. At this time, Richard Harris was still working to remove the bonds from his legs. Aimee Harris gave her name and address and reported that she and her husband had been robbed in their home by two men. The 911 operator asked whether a gun was involved. Aimee Harris stated that she had not seen a gun but that she would ask her husband. Aimee Harris called out to her husband, who was still in the bedroom area, asking if there had been a gun. Richard Harris replied that he had seen a gun.

At trial the state called Aimee Harris as a witness but was unable to call Richard Harris who died on December 21, 1991. When Aimee Harris testified as to her husband's statement that there had been a gun, the defendant objected on the ground of hearsay. The state argued that the statement was admissible under the spontaneous or excited utterance exception. The trial court overruled the defendant's objection.

The defendant attempted to introduce into evidence a tape recording of an interview between Riordan and Richard Harris, claiming that it was a spontaneous utterance. When the trial court refused to admit the tape-recorded interview on that basis, the defendant argued that the recording should be admitted under the catch-all exception to the hearsay rule. The trial court again sustained the state's objection to the admission of the tape recording.

A

We first address the trial court's admission into evidence of Richard Harris' statement that there was a gun involved in the robbery. The trial court properly ruled that this statement was within the spontaneous utterance exception to the hearsay rule. "In *Perry* v. *Haritos*, 100 Conn. 476, 124 A. 44 (1924), our Supreme Court recognized the spontaneous utterance exception to the hearsay rule. This exception allows otherwise inadmissible statements into evidence to prove the truth of the matter asserted if it is proven that (1) the declaration follows some startling occurrence, (2) the declaration refers to the occurrence, (3) the declarant observed the occurrence, and (4) the declaration is made under circumstances that negate the opportunity for deliberation and fabrication by the declarant. *State* v. *Stange*, 212 Conn. 612, 616–17, 563 A.2d 681 (1989); *Perry* v. *Haritos*, supra, 484.

"As a preliminary matter, the trial judge must determine whether an utterance qualifies under this exception to the hearsay rule, and that decision will not be disturbed on appeal unless it constitutes an unreasonable exercise of discretion. *State* v. *Stange*, supra [212 Conn. 616–17]; *State* v. *Chesney*, 166 Conn. 630, 638, 353 A.2d 783, cert. denied, 419 U.S. 1004, 95 S. Ct. 324, 42 L. Ed. 2d 280 (1974); *Perry* v. *Haritos*, supra [100 Conn. 484]." *State* v. *Cayouette*, 25 Conn. App. 384, 387, 594 A.2d 1020 (1991).

The defendant concedes that the robbery was a startling occurrence, that Richard Harris had an opportunity to observe the occurrence, and that the statement in question concerned that occurrence. The defendant argues, however, that "the event was over for Richard Harris when he and his wife heard the intruders leave and his wife contacted the police" and, therefore, that Richard Harris had an opportunity to reflect on his

response that there was a gun, thereby making the spontaneous utterance exception inapplicable. We are not persuaded.

The requirement that a spontaneous utterance be made "under such circumstances as to negative the opportunity for deliberation and fabrication" by the declarant; *Perry* v. *Haritos*, supra, 100 Conn. 484; does not preclude the admission of statements made *after* a startling occurrence as long as the statement is made under the stress of that occurrence. See, e.g., *State* v. *Stange*, supra, 212 Conn. 618–20; *State* v. *Cayouette*, supra, 25 Conn. App. 388. In a particular case, the determination of whether such a statement was made under the stress of that occurrence is best left to the sound discretion of the trial court after weighing all material facts. *State* v. *Cayouette*, supra, 388.

Here, the declarant was a frail elderly man who was robbed in his home and bound by the perpetrators. While he was freeing himself, or immediately thereafter, he was asked if the robbers had a gun and immediately responded in the affirmative. The trial court could reasonably have concluded, as it did, that his response was made without opportunity to reflect on the startling event or to fabricate a response, thereby qualifying as admissible under the spontaneous utterance exception to the hearsay rule.

B

We next turn to the defendant's claim that the trial court improperly refused to admit into evidence the tape recording of Riordan's interview with Richard Harris. Considering the factors outlined previously, we conclude that the trial court acted reasonably in determining that the tape-recorded interview, made three and one-half hours after the robbery, was not made under the stress of the startling occurrence and

thus was not admissible as a spontaneous utterance.[10] We also conclude that the trial court did not abuse its discretion in declining to admit the tape-recorded interview under the residual exception to the hearsay rule.

When a hearsay statement does not fall neatly into one of the established exceptions to the hearsay rule, it may nevertheless be admissible if it can be established that (1) there is a reasonable necessity for the admission of the statement, and (2) the statement is supported by guarantees of reliability and trustworthiness equivalent to those supporting other hearsay exceptions. *State* v. *Sharpe*, 195 Conn. 651, 664, 491 A.2d 345 (1985); *State* v. *Acquin*, 187 Conn. 647, 680, 448 A.2d 163 (1982), cert. denied, 463 U.S. 1229, 103 S. Ct. 3570, 77 L. Ed. 2d 1411 (1983). As with other evidentiary matters, the trial court has broad discretion in ruling on the applicability of the residual exception. *State* v. *Tyson*, 23 Conn. App. 28, 35, 579 A.2d 1083, cert. denied, 216 Conn. 829, 582 A.2d 207 (1990); *State* v. *Erhardt*, 17 Conn. App. 359, 367, 553 A.2d 188 (1989). We will reverse the trial court's refusal to admit evidence under the residual exception only upon a showing of a clear abuse of discretion. *State* v. *Erhardt*, supra, 367.

Here, the trial court ruled that Richard Harris' tape-recorded interview was not admissible under the residual exception to the hearsay rule because the defendant could not establish the reliability and trustworthiness of Harris' statements. The trial court noted that he was very ill at the time of the robbery and died three weeks later. The trial court expressed concern that Richard Harris might have been on medication, or that the stress

---

[10] The defendant argues that it was inconsistent for the state to admit the statement made about the gun and suppress the tape-recorded interview. In light of the different times and conditions of the making of each statement, we see no merit to the claim that the same conclusion must be made as to their admissibility.

of the event might have impaired his powers of observation and communication. In light of these observations by the trial court, we conclude that there was no abuse of discretion in the trial court's refusal to admit Richard Harris' statement to Riordan into evidence.

## IV

We do not consider the defendant's remaining claims regarding jury instructions, prosecutorial misconduct and improper sentencing because our resolution of the suppression issue is dispositive of the appeal.

The judgment is reversed and the case is remanded with direction to grant the defendant's motion to suppress and for a new trial.

In this opinion HEIMAN, J., concurred.

SCHALLER, J., concurring and dissenting. I agree with parts II, III, and IV of the majority opinion. I disagree, however, with the result reached in part I of the opinion, in which the majority concludes that the case must be remanded for a new trial. Accordingly, I respectfully dissent.

I take issue with the majority's disposition of the state's claim of inevitable discovery.[1] The majority

---

[1] The state raised on appeal the claim that the inevitable discovery exception to the exclusionary rule applies. It is not necessary that this claim be raised at trial in order to warrant appellate review. *State* v. *Badgett*, 200 Conn. 412, 432 n.10, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986); but see *State* v. *Billias*, 17 Conn. App. 635, 637 n.3, 555 A.2d 448 (1989). In *Billias*, we cited the failure of the state to raise the claim at trial as one of the grounds for not granting review. In addition, here, the claim appeared in the state's preliminary statement of issues and was fully briefed. See *State* v. *Billias*, supra, 637. Moreover, a remand being necessary, I do not reach the conclusion that there is no basis in the record for finding that "the lawful means which made discovery inevitable were possessed by the police and were being actively pursued *prior* to the occurrence of the constitutional violation." (Emphasis in original.) *State* v. *Badgett*, supra, 433; see *State* v. *Billias*, supra, 637 n.3. Unlike *Billias*, therefore, this case does present an appropriate instance for remand to the trial court to determine whether the inevitable discovery exception to the

declines to consider this claim because the trial court made no findings on this issue, and "we cannot speculate as to what might have happened if the initial arrest had not taken place, including whether there might have been probable cause for a lawful arrest at some later time." The majority concludes that this court would be required to engage in fact finding concerning the investigatory detention as well as probable cause.

I believe, to the contrary, that, in light of our Supreme Court's decision in *State* v. *Badgett,* 200 Conn. 412, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986), the conclusion that the warrantless search of the defendant lacked probable cause does not require us to exclude the evidence unlawfully seized. Rather, it is appropriate to "remand the case to the trial court for further proceedings to determine whether the evidence illegally seized can be admitted under the 'inevitable discovery' exception to the exclusionary rule adopted by the United States Supreme Court in *Nix* v. *Williams,* 467 U.S. 431, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984). *State* v. *Badgett,* supra, 432–33." *State* v. *Miller,* 29 Conn. App. 207, 235, 614 A.2d 1229 (1992), aff'd, 227 Conn. 363, 630 A.2d 1315 (1993).

"Under the inevitable discovery rule, evidence illegally secured in violation of the defendant's constitutional rights need not be suppressed if the state demonstrates by a preponderance of the evidence that the evidence would have been ultimately discovered by lawful means. [*Nix* v. *Williams,* supra, 467 U.S. 444.] To qualify for admissibility, the state must demonstrate that the lawful means which made discovery inevitable were possessed by the police and were being actively pursued *prior* to the occurrence of the constitutional

---

exclusionary rule applies. *State* v. *Badgett,* supra, 433–34; *State* v. *Miller,* 29 Conn. App. 207, 235–36, 614 A.2d 1229 (1992), aff'd, 227 Conn. 363, 630 A.2d 1315 (1993).

violation. *United States* v. *Cherry*, 759 F.2d 1196, 1205 (5th Cir. 1985); *United States* v. *Satterfield*, 743 F.2d 827, 846 (11th Cir. 1985). In *Nix* v. *Williams*, supra, 443, the United States Supreme Court observed that the operation of the exclusionary rule in situations where the police would have inevitably discovered the evidence by legal means already initiated would put the state in a worse position than it would have been in if no police misconduct had transpired. 'Fairness can be assured by placing the State and the accused in the same positions they would have been in had the impermissible conduct not taken place.' Id., 447." (Emphasis in original.) *State* v. *Badgett*, supra, 200 Conn. 433.

In light of *Nix* v. *Williams*, supra, 467 U.S. 431, I would remand the case to the trial court to determine whether the inevitable discovery doctrine applies under the circumstances of this case. See *State* v. *Badgett*, supra, 200 Conn. 433–34; *State* v. *Miller*, supra, 29 Conn. App. 236. "Among the factors to be considered are: (1) whether [a search incident to a lawful arrest or] an inventory search would have been justified under the circumstances; (2) whether such a search would have been conducted according to standard [Hamden] police operating procedures; and (3) whether a search pursuant to these procedures would have uncovered the [the items taken from the defendant's person on the evening of December 2, 1991, and the ring seized on December 3, 1991]." *State* v. *Badgett*, supra, 434; see *United States* v. *Robinson*, 414 U.S. 218, 236, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973); *United States* v. *Gale*, 952 F.2d 1412, 1416 (D.C. Cir. 1992); *United States* v. *Gorski*, 852 F.2d 692, 696–97 (2d Cir. 1988).

Accordingly, I concur in parts II, III, and IV of the majority's opinion, and dissent from part I.