STATE OF CONNECTICUT *v.* RICHARD RODRIGUEZ
(15339)

Callahan, C. J., and Borden, Berdon, Katz and McDonald, Js.

Argued September 26—officially released November 12, 1996

*Carolyn K. Longstreth*, assistant state's attorney, with whom were *David P. Gold*, supervisory assistant state's attorney, and, on the brief, *Michael Dearington*, state's attorney, for the appellant (state).

*Kent Drager*, assistant public defender, for the appellee (defendant).

CALLAHAN, C. J. The defendant, Richard Rodriguez, was charged in a ten count information with crimes committed during the December 2, 1991 robbery of an elderly couple in their Hamden home. The defendant was convicted of all ten counts and sentenced to a

total effective sentence of forty years.[1] He subsequently appealed from the judgment of conviction to this court, and we transferred the case to the Appellate Court pursuant to General Statutes § 51-199 (c).[2] In the Appellate Court, he raised eight claims. The Appellate Court found that the trial court's denial of the defendant's motion to suppress certain evidence was improper and ordered a new trial. *State* v. *Rodriguez*, 39 Conn. App. 579, 665 A.2d 1357 (1995). We granted the state's petition for certification to consider whether the Appellate Court properly determined that the defendant's suppression motion should have been granted by the trial court and, if so, whether the Appellate Court properly ordered a new trial rather than remanding the case for further findings relative to the doctrine of inevitable discovery. *State* v. *Rodriguez*, 235 Conn. 939, 668 A.2d 377 (1996). We reverse the judgment of the Appellate Court.

The following facts are relevant to the determination of the issues presented in this case. On December 2, 1991, at approximately 5:45 p.m., the victims, Aimee and William Harris, heard a vehicle drive up the driveway to

[1] The defendant was convicted of two counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), one count of conspiracy to commit robbery in the third degree in violation of General Statutes §§ 53a-48 (a) and 53a-136, one count of burglary in the third degree in violation of General Statutes § 53a-103, one count of conspiracy to commit burglary in the third degree in violation of General Statutes §§ 53a-48 (a) and 53a-103, two counts of kidnapping in the first degree in violation of General Statutes §§ 53a-92 (a) and 53a-8, two counts of larceny in the second degree in violation of General Statutes §§ 53a-123 (a) and 53a-8, and one count of larceny in the third degree in violation of General Statutes §§ 53a-124 (a) and 53a-8.

[2] General Statutes § 51-199 (c) provides: "The supreme court may transfer to itself a cause in the appellate court. Except for any matter brought pursuant to its original jurisdiction under section 2 of article sixteen of the amendments to the constitution, the supreme court may transfer a cause or class of causes from itself, including any cause or class of causes pending on July 1, 1983, to the appellate court. The court to which a cause is transferred has jurisdiction."

their home on Shepard Avenue in Hamden. Moments later, there was a knock at the door. Aimee Harris opened the door and two men forced their way into the house. Both men were wearing stocking masks and loose, baggy pants with elastic waistbands. One of the men grabbed Aimee Harris and forced her into a bathroom, where he tried unsuccessfully to remove her engagement ring, prompting her to remove the ring herself and hand it over. After also robbing Aimee Harris of cash and additional jewelry, that same man forced her into a dressing room and ordered her to lie down. He then bound her hands and feet with her husband's neckties. Meanwhile, the other man entered the living room, where William Harris, who was frail and quite ill,[3] was lying on a couch. That second robber displayed a handgun and forced William Harris into the dressing room and bound him, also with neckties. That man then took William Harris' wristwatch and his wallet, which contained several hundred dollars. In addition, a VCR and a Macy's bag were stolen from the Harris home. After the two men had left, William Harris was able to cut his wife's bonds with a pair of scissors that had been left in the dressing room. At 6:11 p.m., Aimee Harris dialed 911 and provided a general description of the perpetrators. At approximately 6:15 p.m., the Hamden police broadcast a report of an armed robbery at the Harris home involving two large Caucasian males wearing ski masks and baggy pants with elastic waistbands. The report also stated that one of the perpetrators had a mustache.

Shortly after the broadcast, Sergeant John Kennelly arrived at the victims' home, where he observed a red automobile parked on the side of the road, twenty to twenty-five feet from the victims' driveway. Upon approaching the vehicle, he noted that there was a

---

[3] William Harris died three weeks after the robbery. The state does not claim that his death was related to the robbery.

woman in the driver's seat accompanied by two men, one standing outside the vehicle and the other seated in the rear of the car. Kennelly noted that the man in the back seat was a Hispanic male with dark hair and a mustache. He recognized the man standing alongside the vehicle as Daniel Garrison, a personal acquaintance, and he asked Garrison what he was doing at that location. Garrison responded that they had stopped there because he and his girlfriend, the driver, had been having an argument and she had stopped the car. Kennelly advised Garrison to move along as there recently had been trouble in the area. Kennelly then proceeded to drive up the driveway to the victims' home, where he interviewed the victims briefly. At that point, Kennelly learned from descriptions given by the victims that one of the perpetrators resembled Garrison and that the other had a mustache and had worn a brown leather coat.

Meanwhile, having learned of the radio report, Hamden police officer Gary Komoroski, alert for possible suspects in the Harris robbery, was patrolling Shepard Avenue. At approximately 6:36 p.m., Komoroski observed several vehicles in front of him swerving as if to avoid an obstruction in the road. As he approached the point of the apparent obstruction, he observed a mustached Hispanic male wearing a brown leather jacket and jeans, standing in the roadway and waving his arms frantically in an attempt to flag down passing vehicles. The Hispanic male was later identified as the defendant. At that point, the defendant was approximately 2.4 miles from the victims' home on Shepard Avenue and was walking southbound, away from the victims' residence.

After notifying the police dispatcher that he was leaving his vehicle to question the defendant, Komoroski approached the defendant and asked several questions to which the defendant gave responses that Komoroski

considered suspicious. For example, when asked what he was doing, the defendant said, "just walking." When asked where he was going, the defendant replied that he was walking from New Haven to Hartford.[4] Komoroski then asked the defendant if he knew what town he was in and the defendant replied that he did not know. The defendant then told Komoroski that he had been in a car with a man and a woman and that they had started to fight and had let him out of the car. The defendant also stated that he did not know the names of the people with whom he had been in the vehicle.

Acting on the defendant's implausible and evasive responses, as well as the fact that the defendant had a mustache and was found walking away from the crime scene within a time frame that could have placed him at his present location after having participated in the crimes, Komoroski radioed to Kennelly to tell him that he might have one of the perpetrators of the robbery with him. Kennelly responded that he would be there shortly. Komoroski then returned to the defendant and asked him his name. The defendant responded that his name was Anthony Rodriguez. Komoroski then conducted a patdown search for weapons but found none.

Komoroski subsequently began to issue the defendant a summons for the infraction of reckless use of a highway by a pedestrian in violation of General Statutes § 53-182.[5] While filling out the summons, he asked the defendant for identification in order to confirm the

[4] Komoroski thought this suspicious because he considered walking southbound on Shepard Avenue an unlikely route to travel if one was going from New Haven to Hartford.

[5] General Statutes § 53-182 provides: "Use of highways by pedestrians. Any pedestrian who uses any street or highway negligently or recklessly or fails to obey the signal of any traffic officer, pedestrian control, sign, signal, marking or device or recklessly disregards his own safety or the safety of any person by the manner of his use of any street or highway shall be deemed to have committed an infraction and be fined not less than thirty-five dollars nor more than fifty dollars."

defendant's identity and to complete the summons. Without checking his pockets, the defendant responded that he did not have any identification. Komoroski then asked the defendant either to check his pockets for identification or to empty his pockets to see if he had any identification.[6]

The defendant immediately and voluntarily[7] emptied his pockets and extracted, among other things,[8] a rubber glove and a tin foil packet containing baking soda. When asked by Komoroski about the purpose of these items, the defendant responded that he used them to freebase cocaine. Komoroski then arrested the defendant for possession of drug paraphernalia in violation of General Statutes § 21a-267[9] and placed the defendant in his police vehicle. Shortly thereafter, and approximately ten minutes after Komoroski had first seen the defendant, Kennelly arrived at the scene. After he arrived, Kennelly approached Komoroski's vehicle and immediately recognized the defendant, who was seated in the

---

[6] Komoroski testified at the suppression hearing that he was unsure whether he had asked the defendant to check his pockets or to empty them.

[7] On remand from the Appellate Court for an articulation as to whether the defendant had emptied his pockets freely and voluntarily or under some form of police coercion, the trial court found that "there was no evidence presented which would support the claim that the defendant emptied his pockets as a result of coercion, express or implied. The defendant simply complied with the request to empty his pockets without any intervening action or statements by either the officer or the defendant. Nor was there any evidence that any of the circumstances surrounding the roadside confrontation gave rise to any coercion."

[8] The defendant also produced an identification card from a needle exchange program bearing only the name "Dan." See footnote 14.

[9] General Statutes § 21a-267 provides in relevant part: "Prohibited acts re drug paraphernalia. (a) No person shall use or possess with intent to use drug paraphernalia, as defined in subdivision (20) of section 21a-240, to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain or conceal, or to inject, ingest, inhale or otherwise introduce into the human body, any controlled substance as defined in subdivision (9) of section 21a-240. Any person who violates any provision of this subsection shall be guilty of a class C misdemeanor. . . ."

rear of the police vehicle, as one of the passengers in the red vehicle that had been parked near the victims' driveway.

Thereafter, the defendant, after he had orally waived his *Miranda*[10] rights, voluntarily spoke with Kennelly concerning his activities earlier that evening. The defendant confirmed that he had been in the red car near the victims' driveway. He stated that he had been there because he and the two others in the car had been using cocaine and had pulled over to the side of the road to do so. The defendant stated that he did not know the name of the other male in the car, but that the female's name was either Carol or Chris,[11] despite having previously told Komoroski that he did not know her name. A few minutes after his initial statement to Kennelly, the defendant further stated that at some point the female and the other male had left the vehicle and had walked up the victims' driveway. He said that they later returned down the driveway carrying a Macy's bag. After making this second statement, the defendant was transported to the victims' home for a show-up in order to allow the victims to attempt to identify him.

Upon arriving at the victims' home, the defendant stood on the front walkway illuminated by two lights. The victims observed the defendant from a window in their darkened house. This arrangement was made so that the defendant would be unable to see the victims. There was no evidence introduced at trial relevant to whether the victims, at the show-up, had been able to identify the defendant positively.[12] The defendant was

[10] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[11] The driver was subsequently identified as Carol Orsene. During its case-in-chief the state called Orsene as a witness, and she testified that she had participated in the robbery with her friend Garrison and a man named Rodriguez.

[12] Defense counsel represented to the trial court that the victims had been unable to make a positive identification of the defendant.

then escorted back to the police vehicle where, although he had not been informed of the number, age or gender of the victims, he twice stated that the "old man" and the "old woman" could not identify him.

The following day, while in the Meriden courthouse detention area awaiting his arraignment,[13] the defendant was seen wearing a woman's diamond ring on his finger. When a sheriff asked for the ring in order to inventory it, the defendant removed the ring from his finger, placed it in his mouth and appeared to swallow it. A warrant was thereafter issued for an X ray of the defendant in order to determine the location of the ring. After the warrant had been issued but before the defendant was taken to the hospital, he produced the ring from his pocket and turned it over to the police. The ring was later identified as belonging to Aimee Harris.

On the basis of that factual scenario, the Appellate Court concluded that Komoroski's request that the defendant either check or empty his pockets was an unreasonable search in violation of the fourth and fourteenth amendments to the federal constitution, and that all the statements of the defendant and all physical evidence obtained after that search should have been excluded by the trial court.[14] *State* v. *Rodriguez*, supra,

---

[13] The record is unclear as to whether, at that point, the defendant was awaiting arraignment on the charges relating to the robbery or only the drug paraphernalia charge.

[14] The Appellate Court broadly concluded that the trial court improperly declined to suppress all items taken from the defendant on the evening of December 2, 1991, Aimee Harris' ring, which the defendant wore to his arraignment, and all statements made by the defendant after he had emptied his pockets. *State* v. *Rodriguez*, supra, 39 Conn. App. 591. We note, however, that the state did not introduce at trial any of the defendant's statements, although the defendant himself introduced his statement to Kennelly that he had been in the red car to use cocaine and that he had seen the other occupants of the car walk up the victims' driveway. With regard to the evidence seized from the defendant on the night of the crime, we note that, on direct examination, the state elicited from Komoroski only the facts that the defendant's pockets had contained, among other things, an identification

39 Conn. App. 589–91. The Appellate Court explicitly rejected the state's claim that the chain of events leading to a determination of probable cause for the arrest of the defendant for the Harris robbery "was wholly independent of the purportedly illegal search and custodial arrest for possession of drug paraphernalia." (Internal quotation marks omitted.) Id., 589.

We agree with the state's argument that the facts supporting a finding of probable cause to believe that the defendant had committed the Harris robbery arose from grounds entirely independent of the allegedly illegal search of the defendant's pockets. We therefore conclude that the trial court correctly denied the defendant's motion to suppress. Consequently, we reverse the judgment of the Appellate Court, and remand the case for consideration of the defendant's remaining claims.[15]

We conclude from the record that there were two independent and simultaneous investigations occurring pertaining to the activities of the defendant on the night

card bearing the name "Dan" and an unknown telephone number, and that he had arrested the defendant for an unspecified offense. After the defendant himself had introduced the drug paraphernalia into evidence, Komoroski clarified on redirect that the unspecified offense to which he had referred on direct was possession of drug paraphernalia. Without deciding whether the trial court improperly admitted the state's limited evidence with regard to the content of the defendant's pockets, we conclude that any possible impropriety arising therefrom was harmless beyond a reasonable doubt, in light of its inconsequential connection with the crime and the strength of the other evidence of the defendant's guilt. Therefore, the only piece of evidence with which we are concerned is the ring seized from the defendant the day of his arraignment.

[15] The Appellate Court considered and rejected the defendant's claims that (1) there was insufficient evidence to support "all or at least some of his convictions"; State v. Rodriguez, supra, 39 Conn. App. 592–600; and (2) the trial court had made improper evidentiary rulings pertaining to statements made after the crime by William Harris, who was deceased at the time of trial. Id., 600–605. The Appellate Court has not yet considered the defendant's claims pertaining to jury instructions, prosecutorial misconduct and improper sentencing.

of the Harris robbery. We also conclude that the robbery investigation proceeded from beginning to end without being influenced by the alleged search of the defendant's pockets.[16] It is undisputed that when Komoroski saw the defendant obstructing the highway and engaging in "aggressive hitchhiking," he had a reasonable and articulable suspicion to conduct a brief, investigatory detention of the defendant under *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), in order to determine the reason for the defendant's aberrant conduct and to issue him a summons for reckless use of a highway in violation of § 53-182.

Once Komoroski had lawfully detained the defendant in connection with his behavior on Shepard Avenue, several other factors arose that provided Komoroski with a reasonable and articulable suspicion regarding the defendant's involvement in the robbery at the Harris home.[17] That suspicion led Komoroski to contact Ken-

---

[16] For the purposes of this opinion, we assume, without deciding, that Komoroski's request that the defendant empty his pockets was an unreasonable search in violation of the state and federal constitutions.

[17] We emphasize that the standard for determining whether reasonable suspicion or probable cause existed in a given scenario is an objective, rather than a subjective, one; *Whren* v. *United States*, 517 U.S. 806, 811–13, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996); *State* v. *Dukes*, 209 Conn. 98, 126, 547 A.2d 10 (1988); *State* v. *Copeland*, 205 Conn. 201, 213, 530 A.2d 603 (1987); and that the ultimate questions of reasonable suspicion to stop and probable cause are subject to de novo review on appeal. *Ornelas* v. *United States*, 517 U.S. 690, 696–99, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996). Therefore, we need only apply the facts found by the trial court to determine if, objectively, there were sufficient facts to support, first, a reasonable and articulable suspicion and, second, probable cause. See *Scott* v. *United States*, 436 U.S. 128, 138, 98 S. Ct. 1717, 56 L. Ed. 2d 168 (1978) ("the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action"). Whether the facts found objectively do provide the requisite support can be determined without regard to an officer's subjective state of mind and without resort to hypothesis about events that may or may not have occurred in the absence of another event. We therefore disagree with the Appellate Court that it was not within its power to make

nelly. Those factors included: (1) the fact that the defendant had a mustache, as did one of the perpetrators of the recent robbery;[18] (2) the fact that the defendant was traveling away from the scene of the crime and on the same road on which the crime had occurred; (3) the fact that the short distance from the crime scene easily could have been traveled on foot in the time intervening since the crime; (4) the fact that the defendant claimed to be "just walking," even though Komoroski had seen him aggressively attempting to flag down passing cars; (5) the fact that the defendant claimed to be walking from New Haven to Hartford even though traveling southbound on Shepard Avenue was an unlikely route, and even though a "walk" from New Haven to Hartford would be approximately forty-five miles; (6) the fact that the defendant claimed not to know where he was; and (7) the fact that the defendant claimed to have been traveling with a male and a female whose names he did not know and who had asked him to leave their car.

---

these determinations based on the record before it. See *State* v. *Rodriguez*, supra, 39 Conn. App. 589 ("we cannot speculate as to what might have happened had the initial arrest not taken place, including whether there might have been probable cause for a lawful arrest at some later time").

[18] The defendant emphasizes that, although he had a mustache, he was also wearing blue jeans rather than loose, baggy pants with an elastic waistband, and that he is a Hispanic male of average size rather than a large Caucasian male. We first point out that the type of pants worn by the perpetrators easily could have been removed, and that it is not unlikely that two men who had planned ahead enough to wear stocking masks may also have had the foresight to wear such pants. See *State* v. *Kyles*, 221 Conn. 643, 663, 607 A.2d 355 (1992) ("account must be taken of the possibility that by . . . efforts of concealment some aspects of the description may no longer be applicable" [internal quotation marks omitted]). Moreover, the ethnic identification in this case was made inherently less reliable by the fact that the perpetrators wore stocking masks. "The police . . . are not required to confirm every description of the perpetrator that is broadcast over the radio. 'What must be taken into account [when determining the existence of a reasonable and articulable suspicion] is the strength of those points of comparison which do match up and whether the nature of the descriptive factors which do not match is such that an error as to them is

This information was known to Komoroski well before he asked the defendant to empty his pockets. At that point, considering all the factors together, rather than any one in isolation, Komoroski had sufficient information to form a reasonable and articulable suspicion that the defendant might have been involved in the Harris robbery. See *State* v. *Aillon*, 202 Conn. 385, 400, 521 A.2d 555 (1987) (defendant's proximity in time and place to crime and his driving without headlights at night sufficient to form reasonable and articulable suspicion justifying investigatory detention); *State* v. *Carter*, 189 Conn. 611, 617, 458 A.2d 369 (1983) (defendant's proximity in time and place to crime and his general similarity to description of suspect sufficient to form reasonable and articulable suspicion necessary to justify investigatory detention).

Komoroski therefore had reason to detain the defendant until Kennelly arrived. *State* v. *Carter*, supra, 189 Conn. 618. "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Adams* v. *Williams*, 407 U.S. 143, 146, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972); see *State* v. *Aillon*, supra, 202 Conn. 400 (one function of *Terry* stop is to maintain status quo briefly pending further investigation). "The results of the initial stop may arouse further suspicion or may dispel the questions in the officer's mind. If the latter is the case, the stop may go no further and the detained individual must be free to go. If, on the contrary, the officer's suspicions are confirmed or are further aroused, the stop may be prolonged and the scope enlarged as required by the circumstances." (Internal quotation marks omitted.) *State* v. *Mitchell*, 204 Conn. 187, 197, 527 A.2d 1168,

not improbable . . . .' 3 W. LaFave, [Search and Seizure (2d Ed. 1987) § 9.3 (d), pp. 465–66]." Id.

cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987); *State* v. *Carter*, supra, 617; *State* v. *Watson*, 165 Conn. 577, 585, 345 A.2d 532 (1973), cert. denied, 416 U.S. 960, 94 S. Ct. 1977, 40 L. Ed. 2d (1974).

In an effort to confirm or to contradict his suspicions, Komoroski radioed Kennelly and asked Kennelly to come to his location in order to determine whether the defendant was involved in the Harris robbery. Kennelly responded that he would proceed promptly to Komoroski's location. When Kennelly arrived, he immediately recognized the defendant as the passenger in the rear seat of the red vehicle that had been parked near the crime scene, and he also noted that the defendant was wearing a brown leather jacket and had a mustache. Kennelly read the defendant his *Miranda* rights and, after the defendant's oral waiver, he proceeded to ask the defendant what he had been doing at the crime scene. The defendant responded that he had been using cocaine with the man and the woman in the car. He also said that sometime thereafter the man and the woman had left the vehicle and proceeded up the Harris driveway, returning later carrying a Macy's bag.

At that point, there was probable cause for Kennelly to believe that the defendant had been one of the two perpetrators of the Harris robbery. Kennelly knew that one of the robbers matched the description of his acquaintance, Garrison, and that the other had a mustache and wore a brown leather jacket. The defendant had a mustache and wore a brown leather jacket and had been seen moments after the robbery near the Harris driveway in a car with Garrison. He was then seen again one half hour later walking on Shepard Avenue away from the crime scene and acting in a suspicious manner. He then proceeded to give Komoroski curious and evasive answers to routine questions. The defendant also contradicted his statement to Komoroski when he told Kennelly that he knew the name of the

driver of the red vehicle. These facts, when considered together, were clearly "sufficient to justify the belief of a reasonable person"; *State* v. *Penland,* 174 Conn. 153, 155, 384 A.2d 356, cert. denied, 436 U.S. 906, 98 S. Ct. 2237, 56 L. Ed. 2d 404 (1978); that the defendant had participated in the Harris robbery along with Garrison.[19]

Despite the factors supporting a finding of probable cause, the defendant relies on the allegedly unconstitutional intervening search of his person to support his claim that all of the evidence obtained by the police after that alleged search should have been suppressed. We disagree.

It is clear from the record that the sequence of escalating evidence pointing to the defendant as one of the perpetrators of the Harris robbery proceeded independently of the allegedly unconstitutional search of the defendant's pockets. Rather than simply waiting for Kennelly without taking any further action, which he clearly could have done within the bounds of well established law; *Adams* v. *Williams,* supra, 407 U.S. 146; *State* v. *Aillon,* supra, 202 Conn. 400; Komoroski, with good cause, opted to cite the defendant for reckless use of a highway by a pedestrian in violation of § 53-182. In order to fill out the summons for that offense, Komoroski asked the defendant his name and the defendant responded that his name was Anthony Rodriguez. Komoroski, understandably unwilling to rely on the honor system under the circumstances, asked the defendant for identification in order to verify the name

---

[19] "The process [of determining probable cause] does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *United States* v. *Cortez,* 449 U.S. 411, 418, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981).

he had given and to obtain his current address. Without checking his pockets, the defendant immediately responded that he did not have any identification on his person. Komoroski then asked the defendant to check or to empty his pockets to verify that he did not have any identification. The defendant did so, revealing the drug paraphernalia. Komoroski then placed the defendant under arrest for possession of drug paraphernalia and placed him in the back seat of his police vehicle. Kennelly arrived shortly thereafter.

The defendant in this case seeks a windfall from Komoroski's decision to cite him for the highway infraction and, in turn, Komoroski's asking him to empty his pockets to produce identification. The defendant's position contravenes the exclusionary rule's purpose of ensuring fairness and balancing the interests of the state and the defendant. "Fairness can be assured by placing the State and the accused in the same positions they would have been in had the impermissible conduct not taken place." *Nix* v. *Williams*, 467 U.S. 431, 447, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984). "When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation." Id., 443.

Because Komoroski already had a reasonable and articulable suspicion that the defendant had been involved in the Harris robbery, the defendant was legally being detained solely on the basis of that suspicion, pending Kennelly's imminent arrival. *State* v. *Mitchell*, supra, 204 Conn. 197; *State* v. *Carter*, supra, 189 Conn. 617; *State* v. *Watson*, supra, 165 Conn. 585. Even if we assume, without deciding, that the defendant's compliance with Komoroski's request to empty his pockets resulted in an illegal search, Komoroski already possessed a reasonable and articulable suspicion that allowed him to detain the defendant briefly

while garnering additional facts, before any pocket search took place. Once Kennelly arrived and spoke with the defendant, the police had probable cause to arrest the defendant for the Harris robbery. The intervening search cannot be used by the defendant as a reason for the suppression of evidence obtained independently through constitutional means. To hold otherwise would put the defendant in a far better position than he would have been in had the alleged illegality not taken place. The fourth amendment does not require that we do so. See *Nix* v. *Williams*, supra, 467 U.S. 443–47.

The judgment of the Appellate Court is reversed and the case is remanded to that court for consideration of the defendant's remaining claims on appeal.

In this opinion the other justices concurred.