## RICHARD RODRIGUEZ *v.* COMMISSIONER OF CORRECTION
## (AC 27377)

Harper, Beach and Hennessy, Js.

Argued March 28—officially released June 17, 2008

---

*Damon A. R. Kirschbaum*, special public defender, for the appellant (petitioner).

*Melissa L. Streeto*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Linda N. Howe*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

HARPER, J. The petitioner, Richard Rodriguez, appeals following the denial of certification to appeal from the judgment of the habeas court denying his third amended petition for a writ of habeas corpus. The petitioner claims that the court abused its discretion in denying certification to appeal and improperly rejected his claim that his previous habeas counsel, Vicki H. Hutchinson, had provided ineffective assistance. We dismiss the petitioner's appeal.

In December, 1991, an elderly couple was robbed at gunpoint in their Hamden home. The petitioner subsequently was arrested in connection with the robbery. The petitioner was later convicted, after a trial by jury, of various crimes[1] and received a total effective sentence of forty years imprisonment.

---

[1] Specifically, the petitioner was convicted of two counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), one count of conspiracy to commit robbery in the third degree in violation of General Statutes §§ 53a-48 (a) and 53a-136, one count of burglary in the third degree in violation of General Statutes § 53a-103, one count of conspiracy to commit burglary in the third degree in violation of General Statutes §§ 53a-48 (a) and 53a-103, two counts of kidnapping in the first degree in violation of General Statutes §§ 53a-92 (a) and 53a-8, two counts of larceny in the second degree in violation of General Statutes §§ 53a-123 (a) and 53a-8, and one count of larceny in the third degree in violation of General Statutes § 53a-124 (a) and 53a-8.

Our Supreme Court, in considering the petitioner's direct appeal, recited the following relevant facts: "At approximately 6:15 p.m., the Hamden police broadcast a report of an armed robbery . . . involving two large Caucasian males wearing ski masks and baggy pants with elastic waistbands. The report also stated that one of the perpetrators had a mustache.

"Shortly after the broadcast, Sergeant John Kennelly arrived at the victims' home, where he observed a red automobile parked on the side of the road, twenty to twenty-five feet from the victims' driveway. Upon approaching the vehicle, he noted that there was a woman in the driver's seat accompanied by two men, one standing outside the vehicle and the other seated in the rear of the car. Kennelly noted that the man in the back seat was a Hispanic male with dark hair and a mustache. He recognized the man standing alongside the vehicle as Daniel Garrison, a personal acquaintance, and he asked Garrison what he was doing at that location. Garrison responded that they had stopped there because he and his girlfriend, the driver, had been having an argument and she had stopped the car. Kennelly advised Garrison to move along as there recently had been trouble in the area. Kennelly then proceeded to drive up the driveway to the victims' home, where he interviewed the victims briefly. At that point, Kennelly learned from descriptions given by the victims that one of the perpetrators resembled Garrison and that the other had a mustache and had worn a brown leather coat.

"Meanwhile, having learned of the radio report, Hamden police officer Gary Komoroski, alert for possible suspects in the . . . robbery, was patrolling Shepard Avenue. At approximately 6:36 p.m., Komoroski observed several vehicles in front of him swerving as if to avoid an obstruction in the road. As he approached the point of the apparent obstruction, he observed a

mustached Hispanic male wearing a brown leather jacket and jeans, standing in the roadway and waving his arms frantically in an attempt to flag down passing vehicles. The Hispanic male was later identified as the [petitioner]. At that point, the [petitioner] was approximately 2.4 miles from the victims' home on Shepard Avenue and was walking southbound, away from the victims' residence.

"After notifying the police dispatcher that he was leaving his vehicle to question the [petitioner], Komoroski approached the [petitioner] and asked several questions to which the [petitioner] gave responses that Komoroski considered suspicious. For example, when asked what he was doing, the [petitioner] said, 'just walking.' When asked where he was going, the [petitioner] replied that he was walking from New Haven to Hartford. Komoroski then asked the [petitioner] if he knew what town he was in and the [petitioner] replied that he did not know. The [petitioner] then told Komoroski that he had been in a car with a man and a woman and that they had started to fight and had let him out of the car. The [petitioner] also stated that he did not know the names of the people with whom he had been in the vehicle.

"Acting on the [petitioner's] implausible and evasive responses, as well as the fact that the [petitioner] had a mustache and was found walking away from the crime scene within a time frame that could have placed him at his present location after having participated in the crimes, Komoroski radioed to Kennelly to tell him that he might have one of the perpetrators of the robbery with him. Kennelly responded that he would be there shortly. Komoroski then returned to the [petitioner] and asked him his name. The [petitioner] responded that his name was Anthony Rodriguez. Komoroski then conducted a patdown search for weapons but found none.

"Komoroski subsequently began to issue the [petitioner] a summons for the infraction of reckless use of a highway by a pedestrian in violation of General Statutes § 53-182. While filling out the summons, he asked the [petitioner] for identification in order to confirm the [petitioner's] identity and to complete the summons. Without checking his pockets, the [petitioner] responded that he did not have any identification. Komoroski then asked the [petitioner] either to check his pockets for identification or to empty his pockets to see if he had any identification.

"The [petitioner] immediately and voluntarily emptied his pockets and extracted, among other things, a rubber glove and a tin foil packet containing baking soda. When asked by Komoroski about the purpose of these items, the [petitioner] responded that he used them to freebase cocaine. Komoroski then arrested the [petitioner] for possession of drug paraphernalia in violation of General Statutes § 21a-267 and placed the [petitioner] in his police vehicle. Shortly thereafter, and approximately ten minutes after Komoroski had first seen the [petitioner], Kennelly arrived at the scene. After he arrived, Kennelly approached Komoroski's vehicle and immediately recognized the [petitioner], who was seated in the rear of the police vehicle, as one of the passengers in the red vehicle that had been parked near the victims' driveway.

"Thereafter, the [petitioner], after he had orally waived his *Miranda* rights,[2] voluntarily spoke with Kennelly concerning his activities earlier that evening. The [petitioner] confirmed that he had been in the red car near the victims' driveway. He stated that he had been there because he and the two others in the car had been using cocaine and had pulled over to the side of

---

[2] See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

the road to do so. The [petitioner] stated that he did not know the name of the other male in the car, but that the female's name was either Carol or Chris, despite having previously told Komoroski that he did not know her name. A few minutes after his initial statement to Kennelly, the [petitioner] further stated that at some point the female and the other male had left the vehicle and had walked up the victims' driveway. He said that they later returned down the driveway carrying a Macy's bag. After making this second statement, the [petitioner] was transported to the victims' home for a show-up in order to allow the victims to attempt to identify him.

"Upon arriving at the victims' home, the [petitioner] stood on the front walkway illuminated by two lights. The victims observed the [petitioner] from a window in their darkened house. This arrangement was made so that the [petitioner] would be unable to see the victims. There was no evidence introduced at [the criminal] trial relevant to whether the victims, at the show-up, had been able to identify the [petitioner] positively. The [petitioner] was then escorted back to the police vehicle where, although he had not been informed of the number, age or gender of the victims, he twice stated that the 'old man' and the 'old woman' could not identify him.

"The following day, while in the Meriden courthouse detention area awaiting his arraignment, the [petitioner] was seen wearing a woman's diamond ring on his finger. When a sheriff asked for the ring in order to inventory it, the [petitioner] removed the ring from his finger, placed it in his mouth and appeared to swallow it. A warrant was thereafter issued for an X ray of the [petitioner] in order to determine the location of the ring. After the warrant had been issued but before the [petitioner] was taken to the hospital, he produced the ring from his pocket and turned it over to the police. The

ring was later identified as belonging to [one of the victims]." *State* v. *Rodriguez*, 239 Conn. 235, 238–43, 684 A.2d 1165 (1996).

At the petitioner's criminal trial, the petitioner's trial counsel, Jerome Rosenblum, filed a motion to suppress the introduction of, inter alia, the ring as fruit of the allegedly illegal search of the petitioner's pockets.[3] The court denied the motion. This court reversed the petitioner's conviction on direct appeal, holding that the motion to suppress had been denied improperly, and our Supreme Court then reversed the decision of this court, holding that the motion to suppress had, in fact, been denied properly. See id., 251. The petitioner's conviction was reinstated on remand to this court. See *State* v. *Rodriguez*, 44 Conn. App. 818, 692 A.2d 846, cert. denied, 242 Conn. 902, 697 A.2d 363 (1997).

The petitioner then filed a petition for a writ of habeas corpus, claiming that Rosenblum had rendered ineffective assistance of counsel in failing to cross-examine Komoroski adequately at the suppression hearing. The petitioner's habeas counsel, Hutchinson,[4] did not call Komoroski to testify at the habeas trial. The habeas court denied the petition, and the petitioner did not appeal from that judgment. Instead, the petitioner filed a second petition for a writ of habeas corpus. In his second petition, the petitioner claimed that Hutchinson had rendered ineffective assistance of counsel in failing to call Komoroski to testify at the first habeas trial. The second habeas court denied this second petition and then denied the petitioner certification to appeal. This appeal followed.

"Faced with a habeas court's denial of a petition for certification to appeal, a petitioner can obtain appellate

---

[3] The legality of this search is irrelevant to our disposition of the petitioner's appeal.

[4] Although the petitioner initially filed this petition pro se, Hutchinson commenced representing him prior to the habeas trial.

review of the dismissal of his petition for habeas corpus only by satisfying the two-pronged test enunciated by our Supreme Court in *Simms* v. *Warden*, 229 Conn. 178, 640 A.2d 601 (1994), and adopted in *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994). First, he must demonstrate that the denial of his petition for certification constituted an abuse of discretion. . . . Second, if the petitioner can show an abuse of discretion, he must then prove that the decision of the habeas court should be reversed on its merits. . . .

"To prove an abuse of discretion, the petitioner must demonstrate that the [resolution of the underlying claim involves issues that] are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." (Internal quotation marks omitted.) *Bowens* v. *Commissioner of Correction*, 104 Conn. App. 738, 740–41, 936 A.2d 653 (2007), cert. denied, 286 Conn. 905, 944 A.2d 978 (2008).

Furthermore, "[o]ur Supreme Court set the standard of review to be afforded an appeal from the dismissal of a habeas corpus petition alleging ineffective assistance of habeas counsel in *Lozada* v. *Washington*, 223 Conn. 834, 613 A.2d 818 (1992). To succeed in his bid for a writ of habeas corpus, the petitioner must prove both (1) that his appointed habeas counsel was ineffective, and (2) that his trial counsel was ineffective. A convicted [petitioner's] claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components. First, the [petitioner] must show that counsel's performance was deficient. . . . Second, the [petitioner] must show that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable. . . . Only if the petitioner succeeds in [this] herculean

task will he receive a new trial." (Citations omitted; internal quotation marks omitted.) *Denby* v. *Commissioner of Correction*, 66 Conn. App. 809, 812–13, 786 A.2d 442 (2001), cert. denied, 259 Conn. 908, 789 A.2d 994 (2002).

Our resolution of the petitioner's claim of ineffective assistance of counsel requires a thorough explanation of the parameters of our Supreme Court's analysis in rejecting the petitioner's claim that the trial court had improperly denied his motion to suppress.

On the basis of the aforementioned facts, our Supreme Court concluded that "a finding of probable cause to believe that the [petitioner] had committed the . . . robbery arose from grounds entirely independent of the allegedly illegal search of the [petitioner's] pockets," and the petitioner's motion to suppress had thus been denied properly. *State* v. *Rodriguez*, supra, 239 Conn. 244.

The court explained that "there were two independent and simultaneous investigations occurring pertaining to the activities of the [petitioner] on the night of the . . . robbery," one of which involved the petitioner's suspicious behavior on the highway, the other the robbery itself. Id., 244–45. The court continued that "[i]t is undisputed that when Komoroski saw the [petitioner] obstructing the highway and engaging in 'aggressive hitchhiking,' he had a reasonable and articulable suspicion to conduct a brief, investigatory detention of the [petitioner] under *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), in order to determine the reason for the [petitioner's] aberrant conduct and to issue him a summons for reckless use of a highway in violation of § 53-182.

"Once Komoroski had lawfully detained the [petitioner] in connection with his behavior on Shepard Avenue, several other factors arose that provided

Komoroski with a reasonable and articulable suspicion regarding the [petitioner's] involvement in the robbery . . . . That suspicion led Komoroski to contact Kennelly. Those factors included: (1) the fact that the [petitioner] had a mustache, as did one of the perpetrators of the recent robbery; (2) the fact that the [petitioner] was traveling away from the scene of the crime and on the same road on which the crime had occurred; (3) the fact that the short distance from the crime scene easily could have been traveled on foot in the time intervening since the crime; (4) the fact that the [petitioner] claimed to be 'just walking,' even though Komoroski had seen him aggressively attempting to flag down passing cars; (5) the fact that the [petitioner] claimed to be walking from New Haven to Hartford even though traveling southbound on Shepard Avenue was an unlikely route, and even though a 'walk' from New Haven to Hartford would be approximately forty-five miles; (6) the fact that the [petitioner] claimed not to know where he was; and (7) the fact that the [petitioner] claimed to have been traveling with a male and a female whose names he did not know and who had asked him to leave their car." *State* v. *Rodriguez*, supra, 239 Conn. 245–46. Therefore, the court reasoned, Komoroski had been justified in detaining the petitioner for a short while until Kennelly arrived at the scene, and, on the basis of Kennelly's previous interaction with the petitioner in the area, probable cause existed to arrest the petitioner for the robbery. Id., 247–49. On this basis, the Supreme Court concluded that "the robbery investigation proceeded from beginning to end without being influenced by the alleged search of the [petitioner's] pockets" and that the trial court properly had denied the petitioner's motion to suppress. Id., 245.

The crux of the petitioner's claim of ineffective assistance of counsel is that our Supreme Court based this legal conclusion on a faulty factual basis. The petitioner

contends that although our Supreme Court assumed that Komoroski radioed Kennelly prior to Komoroski's search of the petitioner's pockets, Komoroski clearly testified at the second habeas trial that he contacted Kennelly only after searching the petitioner. The petitioner argues that this factual distinction demonstrates that suspicion of the petitioner as a suspect in the robbery arose only after the search had occurred and, therefore, that the discovery of the ring and subsequent arrest of the petitioner would not have occurred but for the search of the petitioner's pockets. The petitioner concludes that had the trial court been presented with this correct factual basis, which was elicited at this second habeas trial, it would have been compelled to grant the petitioner's motion to suppress the ring as fruit of an illegal search. The petitioner argues that the failure of Rosenblum and Hutchinson to present adequately Komoroski's testimony as to the timing of this radio call, in turn, amounted to ineffective assistance of counsel.

The second habeas court concluded, upon hearing this argument and hearing Komoroski's testimony, that even had counsel's performance been deficient, the petitioner had not been prejudiced thereby. We agree. The second habeas court aptly observed that the precise timing of Komoroski's radio call to Kennelly was irrelevant to the ultimate conviction of the petitioner. The petitioner's contention that the pocket search gave rise to Komoroski's suspicion of the petitioner, and, a fortiori, the petitioner's arrest, simply is not borne out by the facts. Our Supreme Court enumerated seven factors supporting a reasonable and articulable suspicion for Komoroski to have suspected the petitioner's involvement in the robbery, none of which involve or relate to the search of the petitioner's pockets.[5] We agree

---

[5] Indeed, the petitioner conceded at oral argument that an objective reasonable and articulable suspicion existed prior to the search of his pockets. He contended, however, that this objective suspicion was rendered immate-

with the reasoning of the second habeas court and our Supreme Court that the pocket search simply was irrelevant to Komoroski's investigation of the robbery. The petitioner has therefore failed to demonstrate that he was prejudiced by Hutchinson's performance, and his claim of ineffective assistance of counsel must fail. See *Ricks* v. *Commissioner of Correction*, 98 Conn. App. 497, 517–18, 909 A.2d 567 (2006), cert. denied, 281 Conn. 907, 916 A.2d 49 (2007).

In light of the foregoing conclusions, the petitioner has not demonstrated that the issues raised with regard to the court's denial of his petition for a writ of habeas corpus are debatable among jurists of reason, that a court could resolve the issues in a different manner or that the questions raised deserve encouragement to proceed further. Thus, we conclude that the court did not abuse its discretion in denying the petition for certification to appeal.

The appeal is dismissed.

In this opinion the other judges concurred.

---

rial by Komoroski's admission, at the second habeas trial, that he did not form a subjective suspicion until after the pocket search. The plaintiff's contention is nonetheless belied by Komoroski's earlier testimony at the second habeas trial that he had first formed a subjective suspicion after hearing the petitioner's nonsensical answers to his questions, which occurred well before the search of the petitioner's pockets.