STATE OF CONNECTICUT *v.* ERIC ROSARIO
(AC 27959)

DiPentima, Lavine and Beach, Js.

---

Argued November 14, 2008—officially released March 10, 2009

*John W. Watson*, special public defender, for the appellant (defendant).

*Timothy F. Costello*, deputy assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *Paul J. Ferencek*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BEACH, J. The defendant, Eric Rosario, appeals from the judgment of conviction, rendered after a court trial, of two counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) and one count of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-134 (a).[1] The trial court also found the defendant guilty of being a persistent dangerous felony offender pursuant to General Statutes § 53a-40 (a) (1) (A) (iv). On appeal, the defendant claims that (1) the state adduced insufficient evidence to sustain his conviction of robbery and conspiracy to commit robbery, (2) the court improperly permitted the state to introduce into evidence two inculpatory statements he made to the police in violation of

---

[1] The defendant was charged by way of long form information with two counts of robbery in the first degree in violation of § 53a-134 (a) (1) and (3). The court merged the defendant's robbery conviction under § 53a-134 (a) (3) with his conviction under § 53a-134 (a) (1).

*Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), (3) the court improperly admitted into evidence an irrelevant photographic array by which the victim identified the defendant's coconspirator and (4) the court's canvass of the defendant was insufficient to establish that he waived his right to be tried by a finder of fact who was unaware of the part B information. We affirm the judgment of the trial court.

The following facts, as found by the court, and procedural history are relevant to our resolution of the defendant's appeal. In the early morning hours of December 31, 2003, Sono Singh was working alone on the 7 p.m. to 7 a.m. shift at Atlantic News & Variety, a convenience store on Atlantic Street in Stamford. Sometime between 1 a.m. and 1:30 a.m., Singh noticed a man, later identified as Jonathan Rios, enter the store, linger for about fifteen minutes and leave without purchasing anything. Singh was able to notice his physical characteristics and that he was wearing a baseball cap. The defendant stated, during a later interview with police, that he was friendly with Rios and that he waited outside the store while Rios went inside.

Business was slow between 2:45 a.m. and 3 a.m. Singh rested his head on the cashier's counter but did not fall asleep. While Singh was resting his head on the counter, a person, later identified as Rios, entered the store and struck him in the head with what Singh believed to be a metal rod. In a later interview with the police, the defendant admitted to being with Rios in the vicinity of the store and seeing Rios enter the store a second time. Singh looked up and recognized the person who had hit him to be the same man who previously had entered the store. During the attack, Singh saw another man, who was later identified as the defendant, enter the store. He was wearing a bandana around his mouth and nose. The defendant grabbed the cash register on the counter and dropped it on the floor. After dropping

the cash register, he ran from the store. Rios followed him out of the store. Upon leaving the store, the defendant and Rios ran in opposite directions. Singh then attempted to call for help, but he was unable to do so because the telephone cord had been removed from the telephone. Shortly thereafter, a regular customer entered the store and telephoned the police from a pay telephone across the street. Prior to the attack, the register contained bills of various denominations, including $100 bills and $20 bills. After the attack, the cash register did not contain any $100 bills or $20 bills.

At approximately 3:10 a.m., Lawrence Brown, a sergeant with the Stamford police department, was dispatched to the scene. When he arrived, two other officers were already present. Brown noticed the defendant walking on the opposite side of Atlantic Street while talking on his cellular telephone. There were no other pedestrians on the street, and the defendant was dressed only in a thin running suit despite the near freezing temperature. He acted nervous and defensive. He gave the police his name and stated that he lived in New York City but was in Stamford visiting his grandfather, who lived approximately one mile from the scene.

Later, Singh was able to identify Rios from a photographic array as the person who had assaulted him. Singh was unable to identify the second perpetrator because he never saw his face. The police sought the identity of the second perpetrator and interviewed the defendant. At trial, Sergeant Anthony Lupinacci of the Stamford police department, whose testimony the court credited, gave the following account of his two interviews with the defendant. On February 6, 2004, he and Officer Rafael Barquero interviewed the defendant at the Stamford police department. The officers advised

the defendant of his *Miranda* rights.[2] Although the defendant refused to sign an advisement of rights form, he agreed to discuss what had happened on the night in question. The defendant initially told the police that he had traveled by train from New York City to Stamford in the hours before the robbery to attend a family reunion. On the train, the defendant met two men, one of whom was Rios. Upon arriving, the defendant and the two men walked around downtown Stamford for a while. Shortly thereafter, the defendant left the two men and went to his grandfather's house. He remained at his grandfather's house for the rest of the evening until he received a telephone call from Rios, who wanted directions back to the train station. The defendant left his grandfather's house and while walking to meet Rios, he encountered Brown and police Sergeant Ernest Maldonado across the street from the crime scene.

The defendant, who appeared to be extremely nervous during the interview, then began crying and admitted that "he was lying about . . . the story that he just told." He further stated that he and Rios were friends who had traveled from New York City together, and he related the following modified version of events. After arriving in Stamford, the defendant and Rios dropped off some clothing at the house of the defendant's grandfather and then walked around town late at night. At one point, Rios walked into a store on Atlantic Street, stayed for a short time and then left. He and Rios walked around some more but eventually returned to the store. Rios entered the store while the defendant remained outside talking on his cellular telephone. The defendant looked into the store window and saw Rios striking the clerk over the head with some type of stick. The defendant knocked on the window but then ran back

---

[2] See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

to his grandfather's house. Once at his grandfather's house, the defendant changed his clothes. He received a telephone call from Rios asking for directions to the train station. The defendant left his grandfather's house and walked downtown where he encountered the police at the crime scene. When the interviewing officers asked the defendant whether he had entered the store when Rios was striking the clerk, he put his head down and did not respond. The interview concluded, and the defendant returned to New York City.

The police subsequently obtained a warrant for the defendant's arrest. Lupinacci and another officer traveled to New York City to interview the defendant and inform him of the warrant. They met with the defendant and informed him of his *Miranda* rights. Before any questioning began, the defendant stated: "If I talk to you about that night, I'll go to jail for a long time." The defendant thereafter was uncooperative and unwilling to answer questions. The defendant then stated that "[y]ou guys just want me to tell you what happened so I can go—so I can get a lot of time." The defendant did not provide any other statements.

Following a trial to the court, the court found the defendant guilty of the crimes charged in the part A information. Thereafter, on the part B information, the court found the defendant guilty of being a persistent dangerous felony offender under § 53a-40 (a) (1) (A) (iv). The court did not impose an enhanced sentence pursuant to the part B information. The court imposed a total effective sentence of twelve years incarceration followed by eight years special parole. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the state adduced insufficient evidence to sustain his conviction of robbery and conspiracy to commit robbery. He argues that

there was insufficient evidence that (1) a larceny was committed, (2) he was the perpetrator and (3) he conspired with Rios to rob the convenience store. We disagree.

"In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . We note that the [finder of fact] must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the [finder of fact] to conclude that a basic fact or an inferred fact is true, the [finder of fact] is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Davis*, 283 Conn. 280, 329–30, 929 A.2d 278 (2007).

"A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime: (1) Causes serious physical injury to any person who is not a participant in the crime . . . or (3) uses or threatens the use of a dangerous instrument . . . ." General Statutes § 53a-134 (a). "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon

another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny." General Statutes § 53a-133. "Connecticut courts have interpreted the essential elements of larceny as (1) the wrongful taking or carrying away of the personal property of another; (2) the existence of a felonious intent in the taker to deprive the owner of [the property] permanently; and (3) the lack of consent of the owner." (Internal quotation marks omitted.) *State* v. *Torres*, 111 Conn. App. 575, 584, 960 A.2d 573 (2008), cert. denied, 290 Conn. 907, 964 A.2d 543 (2009).

"To establish the crime of conspiracy under § 53a-48, the state must show that there was an agreement between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy. . . . The state must also show intent on the part of the accused that conduct constituting a crime be performed. . . . The existence of a formal agreement between the parties need not be proved; it is sufficient to show that they are knowingly engaged in a mutual plan to do a forbidden act. . . . [I]t is not necessary to establish that the defendant and his coconspirators signed papers, shook hands, or uttered the words we have an agreement. . . . [T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts." (Citations omitted; internal quotation marks omitted.) *State* v. *Patterson*, 276 Conn. 452, 461–62, 886 A.2d 777 (2005).

The defendant first argues that the state adduced insufficient evidence to establish that any money was

taken from the store in the course of the event. We disagree and conclude that the court reasonably could have found, on the basis of the evidence introduced at trial, that money was taken from the cash register. The state presented evidence that money that was present immediately before the crime was missing immediately afterward. Singh testified that prior to Rios' attacking him, the cash drawer of the register contained a few $100 bills and approximately five to ten $20 bills. The state entered, as full exhibits four and five, photographs depicting the smashed cash register on the floor where it was dropped during the robbery. Joseph Steyer, a Stamford police officer, testified that state's photographic exhibits four and five depicted the appearance of the register and money at the time he arrived at the scene. He further testified that when he arrived, Singh was standing outside the front door with another officer who already had arrived. Singh told Steyer that no one had entered the store since the robbery. Steyer testified that he set up a cordon to prevent anyone other than police personnel from entering and that no one touched the crime scene until Officer Corey Caserta arrived and photographed the scene. The photographs show one $20 bill lying on top of the cash drawer. No $100 bills or other $20 bills were visible. In the photograph, $10 bills, $5 bills and $1 bills appear in their appropriate slots, but the slots adjacent to these smaller denominations were empty. This evidence presented by the state allowed the court reasonably to conclude that the $100 bills and $20 bills that had been present in the cash drawer immediately prior to the incident, but which were missing immediately thereafter, were taken during the course of the intervening robbery.

"[I]t is the right and the duty of the [trier of fact] to draw reasonable and logical inferences from the evidence. . . . In considering the evidence introduced in a case, [triers of fact] are not required to leave common

sense at the courtroom door . . . nor are they expected to lay aside matters of common knowledge or their own observations and experience of the affairs of life, but, on the contrary, to apply them to the facts in hand, to the end that their action may be intelligent and their conclusions correct." (Internal quotation marks omitted.) *State* v. *Hyde*, 104 Conn. App. 574, 580, 935 A.2d 639 (2007), cert. denied, 285 Conn. 910, 940 A.2d 809 (2008); see also *State* v. *Caprilozzi*, 45 Conn. App. 455, 696 A.2d 380 (evidence demonstrating, inter alia, large quantity of beer missing from warehouse inventory sufficient to establish defendant's theft of beer), cert. denied, 243 Conn. 937, 702 A.2d 644 (1997).

The defendant next argues that the state adduced insufficient evidence to establish his identity as the man wearing the bandana who participated with Rios in the crimes committed on the night in question. We disagree and conclude that the collective evidence presented by the state allowed the court to find beyond a reasonable doubt that the defendant was the second participant in the robbery and conspiracy. During his February 6, 2004 interview with the police, the defendant initially told the police a version of events that placed him at his grandfather's house during the commission of the robbery. In this version, he had remained at his grandfather's house until he received a telephone call from Rios asking him for directions to the train station. At that point, he encountered Brown and Maldonado outside the crime scene while looking for Rios. After telling the police this version of events, the defendant began crying during the interview and told the police that he had lied to them. He then recounted a second version of events that placed him at the crime scene while the robbery was occurring. See *State* v. *Booth*, 250 Conn. 611, 656–57, 737 A.2d 404 (1999) (evidence that defendant lied to police supports conclusion that lies were made to cover up participation in crime and would be

considered as evidence of consciousness of guilt), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000); *State* v. *Weinberg*, 215 Conn. 231, 255, 575 A.2d 1003 ("[t]he state of mind which is characterized as guilty consciousness or consciousness of guilt is strong evidence that the person is indeed guilty" [internal quotation marks omitted]), cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990). Moreover, during his interview with police in New York City, the defendant stated: "If I talk to you about that night, I'll go to jail for a long time," and, "[y]ou guys just want me to tell you what happened so I can go—so I can get a lot of time."[3]

Singh testified that two men participated in the robbery—one assaulted him with the pipe, and the other, wearing a bandana, grabbed the cash register from the counter and dropped it to the floor. Singh testified that there was no one else outside the store when the robbers fled, let alone someone on a cellular telephone. Brown's testimony placed the defendant in the vicinity of the crime scene dressed inappropriately for the near freezing temperature. In the second version of events that the defendant told the police, he placed himself at the crime scene with the opportunity to commit the crime and with a clear connection to Rios. See *State* v. *Famiglietti*, 219 Conn. 605, 614, 595 A.2d 306 (1991) (defendant's opportunity to commit crime supported finding of guilt). Singh's testimony indicated that there were two perpetrators, but the defendant, in his second

---

[3] The defendant challenges the admissibility of these statements. We discuss this claim in part II. We note that "a claim of insufficiency of the evidence must be tested by reviewing no less than, and no more than, the evidence introduced at trial." *State* v. *Smith*, 73 Conn. App. 173, 180, 807 A.2d 500, cert. denied, 262 Conn. 923, 812 A.2d 865 (2002); see also *State* v. *Rodriguez*, 39 Conn. App. 579, 592–93, 665 A.2d 1357 (1995) (reviewing all evidence in addressing sufficiency of evidence claim, including improperly admitted evidence, after ordering remand because trial court failed to suppress evidence), rev'd on other grounds, 239 Conn. 235, 684 A.2d 1165 (1996).

version of events, mentioned that only Rios was inside the store. He did not mention the presence of another person in the store during the commission of the crime. On the basis of the defendant's inconsistent statements to police, his statements made during the interview in New York City, the victim's testimony that two persons were involved, police testimony regarding the defendant's presence in the vicinity of the crime scene and the defendant's opportunity to commit the crime and connection to Rios, the court reasonably could have concluded that the defendant was the second robber.

The defendant next claims that there was insufficient evidence that he conspired with Rios to rob the convenience store. We disagree and conclude that the evidence presented allowed the court to find that the defendant and Rios knowingly engaged in a mutual plan to rob the store. Rios entered the store between 1 and 1:30 a.m., lingered for approximately fifteen minutes and left. At about 3 a.m., he reentered the store and struck Singh on the head with a pipe. The defendant thereafter entered the store and smashed the cash register on the floor. From these facts, the court could have found beyond a reasonable doubt that the defendant and Rios conspired to rob the convenience store. "Conspiracy can seldom be proved by direct evidence. It may be inferred from the activities of the accused persons." (Internal quotation marks omitted.) *State* v. *Johnson*, 188 Conn. 515, 530, 467 A.2d 1237 (1982).

On the basis of our review of the record, we conclude that sufficient evidence existed to support the defendant's conviction of robbery and conspiracy to commit robbery.

II

The defendant next claims that the court improperly permitted the state to introduce into evidence two inculpatory statements that he had made to police officers

during a May, 2004 interview in New York City in violation of *Doyle* v. *Ohio*, supra, 426 U.S. 610. He contends that his statements, "[i]f I talk to you about what happened that night, I'll go to jail for a long time," and, "[y]ou guys just want me to tell you what happened so I can go—so I can get a lot of time," were invocations of his fifth amendment right to remain silent and improperly were used in evidence against him.[4] We decline to review this claim.

At trial, the defendant objected to the admission of the statements on the grounds that they were made while he was in custody and were involuntary and that the statements were more prejudicial than probative. The defendant did not claim before the court that those statements were expressions of his right to remain silent that were used against him in violation of *Doyle*. Because the grounds claimed on appeal are different from those presented before the trial court, we conclude that the defendant did not preserve his claim.[5] See *State* v. *Marshall*, 87 Conn. App. 592, 598, 867 A.2d 57, cert. denied, 273 Conn. 925, 871 A.2d 1032 (2005). The defendant fails in his principal brief to seek review of his unpreserved claims under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989),[6] or the plain

---

[4] The defendant also claims a violation of his state constitutional rights. He, however, has provided no independent analysis under the state constitution, as required under *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992).

[5] The defendant's custodial status is not relevant to the review of a claim under *Doyle*. "*Doyle* applies whenever [warnings pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)] have been given regardless of an arrest or custody." (Internal quotation marks omitted.) *State* v. *Bell*, 283 Conn. 748, 765, 931 A.2d 198 (2007).

[6] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond

error doctrine. See Practice Book § 60-5. Rather, he seeks review under *Golding* for the first time in his reply brief. "It is a well established principle that arguments cannot be raised for the first time in a reply brief." (Internal quotation marks omitted.) *State* v. *Hill*, 237 Conn. 81, 97 n.23, 675 A.2d 866 (1996). This policy applies to requests for review under *Golding*. See, e.g., *State* v. *Wright*, 62 Conn. App. 743, 756, 774 A.2d 1015 (declining to afford review under *Golding*), cert. denied, 256 Conn. 919, 774 A.2d 142 (2001); *State* v. *Smith*, 57 Conn. App. 478, 483, 749 A.2d 67 (2000) (same). "[T]he reply brief is not the proper vehicle in which to provide this court with the basis for our review under . . . [a *Golding*] analysis." (Internal quotation marks omitted.) *State* v. *Garvin*, 242 Conn. 296, 312, 699 A.2d 921 (1997). Arguments first presented in a reply brief impair the opposing party's opportunity to reply in writing. Accordingly, we decline to review this claim.

### III

The defendant next claims that the court improperly admitted into evidence a photographic array by which Singh had identified Rios as the man who had hit him on the back of the head with a pipe. He argues that this evidence was unrelated to the charged crimes. We disagree.

The following additional facts are relevant to our resolution of this issue. During Singh's testimony, the prosecutor showed him state's exhibit seventeen, which consisted of a photographic array containing eight photographs. Singh testified that the Stamford police had shown him that photographic array, from which he had selected and circled the photograph depicting the man involved in the robbery who had wielded the pipe. He

a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

stated that he did not see the man he had picked out of the array in the trial courtroom.

The prosecutor then offered the array as a full exhibit. The defendant objected to its admission as a full exhibit on the basis of relevance. He claimed that the photographic array would be relevant at the trial of Rios, who had been identified as wielding the pipe, but that it was not relevant at the defendant's trial. The prosecutor responded that the case involved two individuals robbing the victim and that testimony about that second individual was relevant. The court, finding, inter alia, that the photographic array was relevant, overruled the defendant's objection and admitted state's exhibit seventeen as a full exhibit.

As a preliminary matter, we set forth the applicable standard of review. "Section 4-1 of the Connecticut Code of Evidence provides that evidence is relevant if it has any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. Relevant evidence may be excluded, however, if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury . . . . Conn. Code Evid. § 4-3. Unfair prejudice exists when the evidence tends to have some adverse effect upon [the party against whom the evidence is offered] beyond tending to prove the fact or issue that justified its admission into evidence. . . .

"[T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling." (Internal quotation marks omitted.) *State* v. *Harris*, 277 Conn. 378, 388–89, 890 A.2d 559 (2006).

The court did not abuse its discretion in admitting the photographic array into evidence. Evidence of Singh's identification of the defendant's coconspirator was relevant to the issue of whether the defendant conspired to commit the robbery. "To establish the crime of conspiracy under § 53a-48, the state must show that there was *an agreement between two or more persons* to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy." (Emphasis added; internal quotation marks omitted.) *State* v. *Patterson*, supra, 276 Conn. 461–62. Singh's identification of Rios was germane to the issue of whether a coconspirator existed, and the identification allowed the court to find, in conjunction with Lupinacci's testimony, that the photograph identified by Singh depicted Rios and that Rios was one of the two people participating in the robbery. This identification, in conjunction with the defendant's statement to the police that he was with Rios when Rios attacked Singh, and the defendant's inculpatory statements, made it more probable that Rios was involved in the robbery, that the defendant was the second participant in the robbery with Rios and, therefore, that the defendant conspired with Rios to commit the robbery. Accordingly, evidence of Singh's identification of Rios was relevant to the issue of whether the defendant conspired to commit the robbery.

The photographic array was also relevant to the robbery charges. In both robbery counts, the state alleged in the long form information the participation of a second person present in the convenience store. The counts specified that the assault of Singh with a dangerous instrument occurred at the hands of another participant in the robbery. The photographic array, and Singh's testimony regarding it, was relevant to establishing the presence and participation of Rios as the second robber who wielded the pipe.

For the foregoing reasons, the photographic array tended to show that the defendant robbed the convenience store and conspired with Rios to do so and, thus, had some relevance. We do not conclude that the probative value was outweighed by unfair prejudice. "All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Internal quotation marks omitted.) *State* v. *Michael G.*, 107 Conn. App. 562, 574, 945 A.2d 1062, cert. denied, 287 Conn. 924, 951 A.2d 574 (2008). Accordingly, the court did not abuse its discretion when it admitted the photographic array into evidence as a full exhibit.

## IV

The defendant next claims that there must be a showing that he knowingly, intelligently and voluntarily waived his right to be tried by a finder of fact who was unaware of the part B information and that the court's canvass of him was insufficient to establish such a waiver. This claim is not reviewable under the circumstances present in this case. The defendant failed to preserve his claim, as he individually and through trial counsel did not in any way object to the court's presiding over his case despite its disclosure of its inadvertent knowledge of the part B information.[7] The defendant

[7] On the first day of trial before the evidentiary phase of the proceedings had begun, the prosecutor inquired whether the defendant needed to be put to plea again on the amended information. The court looked through the file to find the amended information and to check the defendant's plea status. The court stated, inter alia, that the defendant had been put to plea on the amended information, including the part B information. The prosecutor approached the bench, and the court went off the record. Upon returning on the record, the court stated: "[T]he court had looked through the clerk's file. In doing so, it came across the amended information filed by the state on January 11 of [2006], to which the defendant has pleaded not guilty, as the operative information. The clerk's file also contained a part B information [that] accuses the defendant of being a persistent dangerous felony offender.

"The court took a long recess to allow counsel, number one, to discuss the issue with [the defendant and] also to research the issue a little bit. And

seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40. We decline to review this claim under *Golding* because the defendant's right to an information in two parts is based on Practice Book § 37-11 and, as such, is not a constitutional right.[8] See *State* v. *Marcisz*, 99 Conn. App. 31, 38–39, 913 A.2d 436 (defendant's claim based on Practice Book §§ 36-14 and 37-11 that court's purported knowledge of part B information prior to rendering decision violated his rights to due process

---

there is a case [*State* v. *Fitzgerald*, 257 Conn. 106, 112, 777 A.2d 580 (2001)] . . . wherein on the issue that we're discussing, it reversed a prior decision of the Appellate Court [*State* v. *Fitzgerald*, 54 Conn. App. 258, 266, 737 A.2d 922 (1999), rev'd, 257 Conn. 106, 777 A.2d 580 (2001)]. I've had a chance to discuss that decision with counsel, and I believe that counsel has had a chance to discuss the issue with his client." The prosecutor noted that during discussions conducted off the record, the defense attorney seemed to indicate that the defendant was waiving any objection to the court's hearing the case. The prosecutor asked the court to inquire of the defendant on the record whether he was waiving any claim of judicial bias. Defense counsel stated: "With regard to the part B information, I have discussed the issue with my client. My client is not raising an objection. He is not asking for the court to recuse itself and wishes to proceed with the trial and very much wants his day in court."

The court then canvassed the defendant as follows:

"The Court: . . . You understand that because I've looked at part B of the information, the claim could be made that the court may somehow be biased or prejudiced toward hearing your case because it knows of a part B of the information. And in electing to proceed at trial with me, the court who's presently here, you understand that you would be consenting to me hearing the case and giving up a claim to recuse based upon some sort of bias or prejudice before I hear the facts. Do you understand that?

"[The Defendant]: Yes, sir.

"The Court: All right. And has your lawyer discussed that with you?

"[The Defendant]: Yes, sir.

"The Court: And have you had enough time to discuss it with him?

"[The Defendant]: Yes, sir.

"The Court: All right. And do you consent to me hearing this case?

"[The Defendant]: Yes, sir."

[8] Practice Book § 37-11 provides: "Prior to the time the defendant enters a guilty plea or, if the defendant pleads not guilty, prior to the commencement of trial, the clerk shall notify the defendant, in the absence of the judicial authority, of the contents of the second part of the information. The clerk shall enter on the docket the time and place of the giving of such notification and, where necessary, shall include entry thereof in the judgment file."

and fair trial fails under second prong of *Golding*), cert. denied, 281 Conn. 922, 918 A.2d 273 (2007). We therefore conclude that the defendant has failed to satisfy the second prong of *Golding*, as the claim alleging the violation of a right under the rules of practice is not of constitutional magnitude.[9]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[9] We note, as did the Supreme Court in *State* v. *Fitzgerald*, 257 Conn. 106, 117, 777 A.2d 580 (2001), that "[Practice Book] § 37-11 clearly prohibits the judicial authority from being made aware of the existence of a part B information, thereby assuring that the sentencing enhancement provisions normally contained in a part B information do not unduly influence a fact finder's disposition."